IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

Securities and Exchange Commission,

        Plaintiff,

v.

Daniel Dirk Coddington,
Michael B. Columbia,
Jesse W. Erwin Jr.,
Merlyn Curt Geisler,
Marshall D. Gunn, Jr., CPA,
Seth A. Leyton,
Lewis P. Malouf,
Extreme Capital Ltd.,
Fidelity Asset Services Corp.,
Geisco FNF, LLC,
Golden Summit Investors Group Ltd.,
SouthCom Management LLC,
Stonerock Capital Group LLC,

        Defendants, and,

Daniel Scott Coddington,
Coddington Family Trust,
Joanna I. Columbia also known as Joanna I. Ornowska,
Vincent G. Farris,
Vincent G. Farris Co., L.P.A.,

        Relief Defendants.

---

## COMPLAINT

---

    Plaintiff Securities and Exchange Commission ("SEC") alleges:

    1.    This case involves a securities offering fraud orchestrated by Daniel Dirk

Coddington ("Coddington"), who was the principal architect and primary beneficiary of the

scheme.  Coddington enlisted the other named defendants to participate in and assist him with the scheme, and they also profited substantially from their roles in the scheme.

2.      Coddington's securities fraud followed the general pattern of "prime bank schemes," in which the perpetrators solicit the investment of cash or securities into a vaguely-defined and ultimately non-existent trading program, which purportedly involved leveraging the investors' assets to fund securities trading in order to generate promised astronomical profits. From in or about January 2010 through at least July 2011, Coddington and the other defendants obtained more than $18 million in cash and approximately $14 billion in face, or notional value, of securities known as "Collateralized Mortgage Obligations" ("CMOs") from more than 18 investors nationwide for Coddington's program.  CMOs are bonds that are backed by a pool of residential or commercial mortgages, and pay monthly interest and principal as provided by the terms of the bonds.  CMOs trade in the public securities markets, typically at a market value that is a fraction of their face value.

3.      In this fraudulent scheme, the defendants offered investments in what is referred to herein as "the CMO Trading Program," that would purportedly produce annual returns ranging from 250% to 475% using CMOs purchased with investors' funds or CMOs provided by investors.  Specifically, the defendants represented that they had access to financing sources whereby they could "hypothecate" or pledge the CMOs to obtain loans of 5% of the current value of the CMOs.  Defendants further represented that they would use the leveraged loan proceeds to both make distributions of funds back to investors and to earn astronomical profits for investors through a purported equities trading platform.

4.      In reality, these representations were false.  The CMO Trading Program did not exist.  Defendants did not have access to financing sources to obtain loans with the CMOs, none

of the CMOs were hypothecated, investors did not receive distributions of funds, no loan proceeds were invested in any equities trading platform, and defendants spent investors' funds and used investors' CMOs for their own personal purposes.  As a result of the scheme, investors suffered total losses of their invested funds and most lost the CMOs they invested in the scheme.

5.      Coddington recruited Lewis P. Malouf ("Malouf"), Merlyn Curt Geisler ("Geisler"), and Marshall D. Gunn, Jr. ("Gunn") to solicit investors for the CMO Trading Program.  Malouf, Geisler, and Gunn made false and misleading statements to investors about the purported CMO Trading Program.  They each also made false and misleading "lulling" statements to investors about purported delays in the CMO Trading Program to prevent investors from demanding the return of their funds or CMOs, and from contacting regulatory authorities. Malouf, Geisler, and Gunn received investors' funds from Coddington as a result of their participation in the scheme.

6.      Coddington also enlisted his attorney, Jesse W. Erwin, Jr. ("Erwin"), to participate in the scheme.  Erwin made false and misleading statements to investors regarding the CMO Trading Program, and he received investors' funds into his attorney trust account and improperly distributed the funds to participants in the scheme.  Erwin also sent lulling letters and emails to investors containing false and misleading statements about purported delays in the CMO Trading Program to prevent investors from demanding return of their funds or CMOs, and from contacting regulatory authorities.  Erwin received investors' funds from Coddington as a result of his participation in the scheme.

7.      Coddington also recruited Seth Leyton ("Leyton"), a registered representative and owner of the securities brokerage firm named "Viewpoint Securities LLC" ("Viewpoint Securities") to assist with the scheme.  At Coddington's direction, Leyton opened brokerage

3

accounts to enable investors to transfer their CMOs to the defendants, delayed return of the CMOs to investors when Coddington was unable to hypothecate them, sold investors' CMOs, and transferred investors' CMOs out of Viewpoint Securities brokerage accounts to other accounts where they were sold contrary to agreements with investors.  Leyton received investors' funds from Coddington and promises of additional business from Coddington as a result of his participation in the scheme.

8.      Coddington also enlisted Michael Columbia ("Columbia") to liquidate investors' CMOs as part of the scheme.  Columbia sold a portion of the investors' CMOs for approximately $3.4 million and paid a portion of the proceeds back to Coddington.  Columbia and his wife, relief defendant Joanna Columbia, misappropriated the balance of the funds from the sale of the CMOs to pay their personal expenses.

9.      In addition to their fraudulent conduct, Coddington, Malouf, Geisler, Gunn, and entities they controlled acted as unregistered broker-dealers in offering the CMO Trading Program to investors, and each offered and sold unregistered securities in violation of the federal securities laws.

10.     Finally, Coddington transferred ill-gotten gains to his son, Scott Coddington, the Coddington Trust, Vincent G. Farris Co. LPA, and its principal, Vincent G. Farris, without receiving any consideration in exchange.

## DEFENDANTS

11.     Defendant **Daniel Dirk Coddington** ("Coddington"), who was born in 1954, is a resident of Colorado Springs, Colorado.  He is the father of Daniel Scott Coddington ("Scott Coddington").  In response to a SEC subpoena seeking his testimony under oath during the

investigation of this matter, Coddington refused to answer any questions asserting his right against self-incrimination under the Fifth Amendment to the U.S. Constitution.

12.     Defendant **Golden Summit Investors Group Ltd.** ("Golden Summit") was incorporated in Nevada on July 26, 1999.  At relevant times, Golden Summit's principal place of business was Colorado Springs, Colorado.  Golden Summit represented that it engaged in asset-based lending and project funding.  Coddington was the chief executive officer, chief financial officer, president, secretary, and director of Golden Summit.  Coddington was a signatory on Golden Summit's bank accounts.  Golden Summit is owned by Coddington and he does business as "Golden Summit."

13.     Defendant **Extreme Capital Ltd.** ("Extreme Capital") was incorporated in Nevada on July 29, 1999.  Extreme Capital was also incorporated in Colorado in 2010.  At relevant times, Extreme Capital's principal place of business was Colorado Springs, Colorado.  Coddington and his son, Scott Coddington, were officers or directors of Extreme Capital and signatories on its bank accounts.

14.     Defendant **Lewis P. Malouf** ("Malouf"), who was born in 1943, is a resident of Huntington Beach, California.  He was an executive vice president of Extreme Capital.  In response to a SEC subpoena seeking his testimony under oath during the investigation of this matter, Malouf refused to answer any questions asserting his right against self-incrimination under the Fifth Amendment to the U.S. Constitution.

15.     Defendant **Merlyn Curt Geisler** ("Geisler"), who was born in 1952, is a resident of Jacksonville, Florida.

16.     Defendant **Marshall D. Gunn, Jr.** ("Gunn"), who was born in 1953, is a resident of Orange Park, Florida.  Gunn is a certified public accountant licensed with the state of Florida.

17.     Defendant **SouthCom Management LLC** ("SouthCom") is a Florida limited liability company formed in December 2009.  Its principal place of business is in Jacksonville, Florida.  SouthCom was managed by Gunn and Geisler, who were its members.

18.     Defendant **Fidelity Asset Services Corporation** ("FASC") is a Florida corporation incorporated in December 2009.  Its principal place of business is Jacksonville, Florida.  Gunn was the president and secretary of FASC; and Geisler was a signatory on FASC's bank account at Ironstone Bank.

19.     Defendant **Geisco FNF, LLC** ("Geisco") is a Florida limited liability company formed in March 2010.  Its principal place of business is Jacksonville, Florida. Geisco was established to allow investors to pool their money for investment purposes.  Geisco was managed by Geisler and Gunn.

20.     Defendant **Jesse W. Erwin, Jr.** ("Erwin"), who was born in 1966, is a resident of Las Vegas, Nevada.  Erwin is an attorney admitted to practice law in the state of New York.  In response to a SEC subpoena seeking his testimony under oath during the investigation of this matter, Erwin refused to answer any questions asserting his right against self-incrimination under the Fifth Amendment to the U.S. Constitution.

21.     Defendant **Seth A. Leyton** ("Leyton"), who was born in 1967, is a resident of San Diego, California.  He was a registered representative, chief executive officer, managing member, and chief compliance officer of Viewpoint Securities, which was a securities brokerage firm with its principal place of business in San Diego, California.  Viewpoint Securities withdrew its registration as a broker-dealer with the SEC, which was effective on December 22, 2012.  On or about October 11, 2013, FINRA barred Leyton from association with any FINRA member in any capacity in connection with his conduct alleged in this Complaint.

22.     Defendant **Michael B. Columbia**, ("Columbia"), who was born in 1985, was a resident of Arizona at all times relevant to the Complaint.  Columbia is currently being detained in Arkansas pending resolution of charges that he violated 18 U.S.C. §§ 1343 and 2(b), for wire fraud and aiding and abetting.

23.     Defendant **Stonerock Capital Group LLC** ("Stonerock") was a Nevada limited liability company created on June 15, 2010, with its principal place of business in Arizona.  Its status as a LLC was revoked by the Nevada Secretary of State on May 1, 2013.  Columbia was a managing member and listed as the chief executive officer ("CEO"), chairman, and executive vice president of Stonerock.

24.     Relief defendant **Joanna I. Columbia**, also known as Joanna I. Ornowska, is the wife of Columbia.  She was listed as a board member and CEO of Stonerock.  She is a resident of Arizona.

25.     Relief defendant **Daniel Scott Coddington**, known as Scott Coddington ("Scott Coddington"), was born in 1976, and is a resident of Colorado Springs, Colorado.  He is the son of Coddington.  From at least September 11, 2009, Scott Coddington was the vice president, treasurer, and director of Golden Summit, and signatory on its bank accounts.  He was an officer and director of Extreme Capital, and signatory on its bank accounts.

26.     Relief defendant **Coddington Family Trust** ("Coddington Trust") is a trust formed in Colorado in or about 2004.  Its principal place of business is Colorado Springs, Colorado.  Coddington and Scott Coddington are the trustees of Coddington Trust.

27.     Relief Defendant **Vincent G. Farris** ("Farris") is a resident of Ohio.  He is an attorney licensed to practice law in Ohio since 1993.

28.     Relief Defendant **Vincent G. Farris Co., LPA** ("Farris Co.") is a limited professional association formed in Ohio.  Farris is a partner of Farris Co.

## JURISDICTION AND VENUE

29.     The SEC brings this action under Section 20(b) of the Securities Act of 1933 ("Securities Act"), and Section 21(d) and (e) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 77t(b), 78u(d) and (e); to restrain and enjoin the defendants from engaging in the acts, practices and courses of business described in this Complaint, and acts, practices and courses of business of similar purport and object.  The SEC seeks permanent injunctions, disgorgement of ill-gotten gains derived from the conduct alleged in the Complaint, and third-tier civil penalties under Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act, 15 U.S.C. §§ 77t(d) and 78u(d)(3).

30.     This Court has jurisdiction under Section 22(a) of the Securities Act, and Section 27 of the Exchange Act, 15 U.S.C. §§ 77v(a) and 78aa.

31.     The defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce or of the mails, in connection with the acts, practices and courses of business alleged in the Complaint.

32.     Certain of the acts, practices, and courses of business constituting violations of law alleged in the Complaint occurred within the District of Colorado.  In addition, Coddington and Scott Coddington reside, and Golden Summit, Extreme Capital and the Coddington Trust have their principal place of business in Colorado.  Erwin, Malouf, Leyton, Geisler, Gunn, SouthCom, Geisco, FASC, Columbia, and Stonerock engaged in transactions within the District of Colorado.

## SCHEME TO DEFRAUD

33.     The primary object of the defendants' fraudulent offering scheme was to induce

investors to invest funds or CMOs into the purported CMO Trading Program in order to

misappropriate funds or misuse the CMOs.  At all times, defendants' fraudulent scheme involved

some or all of the following manner and means, including:

     a.  Making misleading statements and omissions to investors to induce them to
invest funds or CMOs into the CMO Trading Program;

     b.  Misappropriating investors' funds for the defendants' own personal uses;

     c.  Using investors' CMOs for the defendants' own personal uses, such as
misappropriating interest due under the terms of the CMOs or selling the CMOs
and misappropriating the proceeds;

     d.  Transferring funds and CMOs contrary to the investment agreements between the
defendants and investors; and

     e.  Making lulling statements to investors to prevent them from discovering the
fraud, seeking a return of their funds or CMOs, or contacting regulatory
authorities.

34.     Although the fraudulent scheme evolved over time, at all times the defendants

relied upon one or more of the following core representations to solicit funds or CMOs from

investors, including that:

     a.  The defendants possessed specialized knowledge and experience and had access
to an equities trading platform that provided astronomical returns ranging from
250% to 475% annually from equities trading;

     b.  The defendants would use investors' funds to purchase CMOs to use in the CMO
Trading Program;

     c.  The defendants would use CMOs owned by investors, or CMOs purchased with
investors' funds, to serve as collateral in order to "hypothecate" the CMOs to
obtain loan proceeds of 5% of the current value of the CMOs;

     d.  This hypothecation of CMOs would allow investors to receive advance
distributions in amounts roughly equal to their initial cash investment or the
current value of their CMO within 15 to 30 days.  The remaining funds derived

through the hypothecation would be pledged to the equities trading platform in order to generate the returns ranging from 250% to 475% annually;

e.   Investments would be held in the equities trading platform for one year, with profit disbursements made weekly or bi-weekly; and

f.   No fees or commissions would be paid by investors until the CMOs were successfully hypothecated.

35.   All of these representations were false.  In fact:

a.   None of the defendants possessed specialized knowledge and experience or had access to an equities trading platform that provided astronomical returns ranging from 250% to 475% annually from equities trading;

b.   The defendants used only a portion of investors' funds to purchase CMOs;

c.   The defendants did not use CMOs owned by investors, or CMOs purchased with investors' funds, to serve as collateral for hypothecation to obtain loans;

d.   The defendants did not successfully hypothecate any CMOs, they failed to provide any of the promised distributions or profits, and they failed to invest any funds into an equities trading platform;

e.   The defendants misappropriated investors' funds prior to even seeking to hypothecate CMOs (which ultimately never occurred); and

f.   Coddington paid compensation to defendants and others out of investors' funds before the CMOs were hypothecated, loans obtained or any trading occurred.

36.   As explained further below, during the period at issue, defendants used variations of the above manner and means and misrepresentations to carry out the fraudulent scheme.

A.   The Scheme Began with Coddington, Erwin, and Malouf, Who Then Recruited Geisler and Gunn

37.   Prior to 2010, Coddington, Malouf, and Erwin had been business associates in offering various investment schemes to investors.

38.   This scheme began in or about January 2010, when Coddington and Malouf agreed that Malouf would solicit investors into the CMO Trading Program.

39.     At that time, Coddington and Malouf agreed that they would represent to investors that they had the ability to hypothecate or pledge CMOs as collateral to obtain loans from a funding source which funds would be used to pay pre-trade distributions to investors and to invest in a trading platform that could generate profits of more than 475% within a year.

40.     In or about January 2010, Malouf recruited Geisler, Gunn, and their entity, SouthCom, to act as brokers to find investors with CMOs to invest in the purported CMO Trading Program.  In telephone conversations and emails, Malouf described the CMO Trading Program to Geisler and Gunn with the understanding that they would use this information to solicit investors.

41.     In furtherance of the scheme, Malouf sent Geisler and Gunn an email on January 25, 2010, in which he explained the steps of the program and sent financial projection charts for Geisler and Gunn to give to investors.

42.     Geisler forwarded Malouf's January 25, 2010 email and charts to Gunn stating, "Marshall I thing (sic) we have a home run ... take a look at these pro forma's (sic)."

43.     The information Malouf provided to Geisler and Gunn about the CMO Trading Program was materially false and misleading since Malouf, Coddington and Golden Summit did not have the ability to hypothecate the CMOs and obtain loans, to act as a funding source of loans, or to make pre-trade distributions to investors.  Nor did they have access to a trading platform that could generate the promised profits of 475% per year.  Malouf knew, or was reckless in not knowing, that the information he provided to Geisler and Gunn was false. Nonetheless, he provided the misleading information to Geisler and Gunn knowing it would be communicated to investors.

44.     Shortly after being contacted by Malouf, in or about January 2010, Geisler, Gunn, and SouthCom began soliciting investors through telephone conversations and emails.  In the communications with possible investors, Geisler, Gunn, and SouthCom made false and misleading statements about the CMO Trading Program using the information that was provided to them by Malouf.

45.     In or about January 2010, Geisler and Gunn on behalf of SouthCom had conversations with, and sent emails to, at least three investors and falsely represented that:

    a.  Malouf or the funding source would hypothecate the investors' CMOs to obtain loans;

    b.  Malouf or the funding source would pay pre-trade distributions of between $500,000 and $1,000,000 to each investor; and

    c.  Malouf or the funding source would invest the loan proceeds in a trading platform that would generate profits of approximately 475%.

46.     Geisler, Gunn and SouthCom knew, or were reckless in not knowing, that their statements to investors about the CMO Trading Program were false and misleading.  Geisler, Gunn, and SouthCom conducted no due diligence or investigation to determine whether Malouf's representations about the structure and profitability of the CMO Trading Program were true.  They did no investigation to determine the identity of the purported funding source, to verify its financial ability to make loans of tens of millions of dollars, or to determine whether it had any experience or success trading securities and generating returns of up to 475% per year.

47.     By means of their false and misleading statements, Geisler, Gunn and Southcom, convinced three investors to invest CMOs with total face values of approximately $4.6 billion into the CMO Trading Program.  The CMOs were transferred into an account at a securities brokerage firm in the name of Golden Summit on or about February 12, 2010.

48.     Shortly thereafter, Malouf, Geisler and Gunn failed to deliver on the promises they made to the three investors relating to the purported CMO Trading Program.

49.     In furtherance of the scheme, from on or about February 17, 2010, through at least May 4, 2010, Malouf spoke with, and sent dozens of emails to Geisler and Gunn, in which he represented a variety of false excuses for delays in the required payments that were due to the three investors.  Malouf made these false and misleading statements to Geisler and Gunn with the intention that his statements would be repeated to the investors.  By means of these statements, Malouf delayed return of the CMOs until approximately May 2010.

50.     Geisler and Gunn knew or were reckless in not knowing that Malouf's lulling statements were false and misleading.  Yet in furtherance of the scheme, they repeated Malouf's false and misleading statements to the investors, aided the concealment of the fraud, and delayed the investors' requests for return of the CMOs.

51.     Between February 12, and April 30, 2010, by means of Malouf, Geisler and Gunn's false statements to investors, Golden Summit and Coddington obtained approximately $131,122 in interest payments paid on the three investors' CMOs that had been deposited into Golden Summit's brokerage account.  Coddington, as an officer and director of Golden Summit, controlled Golden Summit's brokerage account.

52.     Coddington misappropriated the interest payments from the CMOs to pay for his debit card transactions and also made transfers to Golden Summit's bank account for his personal benefit.

53.     In or about May, 2010, Golden Summit and Coddington returned the CMOs to the three investors after the investors made demands to the brokerage firm for their return.  As a result, the brokerage firm closed Golden Summit's account.

13

B.      Leyton Assists the Scheme Despite Clear Red Flags About the Activities of Coddington and Malouf

54.     Following the closure of Golden Summit's first brokerage account, Coddington telephoned Leyton, a registered representative and owner of Viewpoint Securities located in San Diego, California, to open a new brokerage account for Golden Summit ("Golden Summit's Viewpoint Securities account") on or about May 21, 2010.  Leyton sent the new account documents to Coddington in Colorado.  Coddington was authorized to buy or sell securities, or to withdraw funds from Golden Summit's Viewpoint Securities account.

55.     When Leyton gathered information about Golden Summit to open the account, he learned that Golden Summit and Malouf were identified in news articles as participating in the Bayou Hedge Fund Group fraud in 2005, through which more than $300 million raised from investors was misappropriated by fund managers.  Despite this, he opened the account for Golden Summit and Coddington.

56.     On or about June 18, 2010, Leyton became aware of a dispute over the ownership of certain CMOs that had been transferred into Golden Summit's Viewpoint Securities account when the owner of the CMOs contacted Viewpoint Securities to locate and regain possession of the CMOs.

57.     On June 22, 2010, Golden Summit received a monthly interest payment of $18,051.98 on the CMOs.  Coddington immediately wired $18,000 of that amount to Golden Summit's JP Morgan Chase bank account.

58.     Over the next month, Leyton exchanged several emails with Coddington and the owner of the CMOs through which Leyton learned that Coddington misrepresented the details of the CMO transaction, and that Malouf misrepresented that the CMOs could not be returned because the owner's brokerage account was closed.

59.     Subsequently, on or about July 3, 2010, Leyton sent emails to the CMO owner's attorney and Coddington questioning the legality of the transaction, asking whether it was an unregistered securities transaction, and indicating that he might contact the Financial Industry Regulatory Authority, Inc. ("FINRA") and the SEC about the matter.

60.     On or about July 8, 2010, Coddington provided Leyton with an email that falsely stated that the owner no longer sought the return of its CMOs, instead preferring to proceed with the transaction.  Although Leyton discovered these statements were untrue and designed to obstruct or delay return of the CMOs, Leyton nonetheless continued his business relationship with Golden Summit.

61.     To smooth over the relationship with Leyton, Coddington emailed Leyton on July 9, 2010, that he was about to close on some "Bank of Ireland bonds" and would pay Leyton $50,000 as a fee related to the deal.

62.     On July 10, 2010, Leyton emailed the CMO owner's attorney and Coddington about signing a legal release for the delivery of the CMOs.  He stressed that "zero is exactly the amount my firm is going to realize from this transaction regardless of anyone's performance (or lack thereof)" and demanded they "[g]et this bond and this f***ed up, unlicensed, unregistered transaction out of my firm."

63.     Then, on July 15, 2010, Leyton emailed Coddington that he had not received the signed release for the CMOs and planned to freeze Golden Summit's Viewpoint Securities account by noon.  But, Leyton did not freeze the account.  Instead, at the end of the day he sent another email to Coddington, stating:  "Let's get back on the subject of business.  Golden Summit earned [$]18,000 utilizing my firm as a platform.  Viewpoint has incurred fees.  Fair?  Not even close to being fair.  To be honest it's so egregiously unfair it's causing me problems

with my business partners.  Problems, I don't need.  What is in the hopper?  And please be specific."

64.     On July 16, 2010, Coddington emailed a response to Leyton's overture, stating: "On some future business I have some funds coming on Wednesday I was going to pay your firm or you $5,000 to help out and for services. . . . Where do you want that paid company or you? Please advise so I can make appropriate plans!!! Makes no difference to me you decide."

65.     On or about July 21, 2010, Leyton received the signed release from Coddington to return the CMOs, but delayed processing it until July 22, 2010.  This delay allowed Golden Summit to receive an additional monthly interest payment of $18,811.88 from the CMOs.  Upon receipt of the interest payment on July 22, 2010, Coddington immediately wired $18,711 to Golden Summit's JP Morgan Chase bank account.

66.     Later on July 22, 2010, Viewpoint Securities transferred the CMOs out of Golden Summit's account and back to the owner.

67.     On July 23, 2010, after the second interest payment had been received on the CMO, Coddington wired from Golden Summit's JP Morgan Chase bank account $9,355.94, approximately half of the second interest payment, to a bank account controlled by Leyton under the name of Noah Capital LLC.

68.     Subsequently, after receiving the payment from Coddington and the promise of future business, Leyton stopped raising questions about the problem CMO transaction and did not contact FINRA or the SEC.  As described below, after July 2010, Leyton assisted Coddington and others in the scheme and received additional funds from Coddington.

C.      Coddington, Golden Summit, Geisler, Gunn, SouthCom, Geisco, and FASC
        Continue the Scheme with New Investors

69.      After successfully finding the initial three investors, Geisler, Gunn, and their

entities entered into an arrangement with Coddington to continue offering the CMO Trading

Program, dealing directly with Coddington rather than through Malouf.

70.      On or about July 6, 2010, Geisler spoke by telephone with Coddington in

Colorado.  They agreed that Geisler, Gunn, and SouthCom would act as brokers to offer and sell

investments in the CMO Trading Program to investors.

71.      After the call, Geisler emailed Gunn and stated: "Dan [Coddington] who is the

managing architect behind the trade programs as well as the real reason Lew [Malouf] exists has

just approved us to be a principle [sic] trade program manager. . . .  Marshall we have arrived I

never thought we could stand the pain but because of Lew and his attitude and my background

we have been invited into the real world of wealth."

72.      On or about September 22, 2010, Geisler and Gunn signed agreements with

Coddington and Golden Summit memorializing their verbal agreement to offer and sell

investments in the CMO Trading Program.  Gunn emailed the agreements to Coddington in

Colorado.

73.      Geisler and Gunn entered into the agreements despite the fact that they already

knew that Coddington had failed to deliver on his earlier promises with respect to the investors

whom they had solicited into the CMO Trading Program through Malouf.

74.      Coddington sent the agreements to his attorney, Erwin.  These documents along

with his prior business dealings with Coddington and Golden Summit provided Erwin with

knowledge that Coddington and Golden Summit were obtaining CMOs from investors, which

were to be hypothecated to provide loan proceeds for investment in a trading platform that

purportedly provided substantial profits.

75.     In telephone calls and emails during September 2010, Coddington, Geisler, and

Gunn refined their pitch for the CMO Trading Program.  They agreed to solicit funds or CMOs

from investors by representing to investors that:

    a.    Golden Summit and Coddington would obtain loans of 5% of current value of the
CMOs by hypothecating the CMOs obtained from investors or purchased using
investor funds, which were to remain in Golden Summit's brokerage account;

    b.    Golden Summit and Coddington would pay part of the loan proceeds as a pre-
trade distribution to investors with fifteen days of delivery of the CMOs;

    c.    Golden Summit and Coddington would invest the balance of the loan proceeds in
an equities trading platform that would generate profits of at least 1.25% per
trading tranche with 200 tranches to be completed within a year (for a total return
of approximately 250%); and

    d.    Golden Summit and Coddington would return the CMOs to investors at the
conclusion of the investment.

76.     Coddington knew that Golden Summit and he did not have the ability to serve as

a funding source to provide loans to the investors, and that they did not have access to a trading

platform that paid 1.25% per tranche or that could generate returns of approximately 250%

annually.

77.     Similarly, Geisler, Gunn and SouthCom knew, or were reckless in not knowing,

that Coddington and Golden Summit could not meet the terms of the proposed investment.

Geisler and Gunn did no due diligence to determine if Coddington and Golden Summit could do

so, and were aware of the failure of the CMO trading Program with respect to the investors they

solicited through Malouf.

78.     Geisler and Gunn created an operating agreement for Geisco to pool investors' money and CMOs for the purpose of purchasing and hypothecating CMOS through Golden Summit.

79.     In September 2010, Geisler and Gunn on behalf of SouthCom, Geisco and FASC created offering documents including a cover letter, program guidelines, and various agreements that they sent by email to investors who wanted to invest in the CMO Trading Program (jointly referred to as "the Offering Documents").  Geisler and Gunn used copies of documents sent to them by Coddington as templates for the Offering Documents.

80.     In or about September 2010 until November 2010, Geisler, Gunn, and their respective entities solicited investors to invest cash or CMOs into the CMO Trading Program.  In so doing, Geisler, Gunn, SouthCom, Geisco, and FASC repeated in the Offering Documents and their conversations and emails with investors the false and misleading statements set forth in paragraph 75 above.

81.     Geisler and Gunn signed many of the Offering Documents that they gave to investors.  Geisler, as the managing director of SouthCom, signed the various agreements sent to investors.  Gunn, as the managing director of FASC, signed one form that pertained to the intended distribution of proceeds.

82.     As part of the Offering Documents, Geisler, Gunn, SouthCom, Geisco, and FASC also provided each of the investors with exhibits that were prepared by Gunn based on information provided by Coddington and Golden Summit.  Geisler signed the exhibits.  In these exhibits the defendants falsely represented among other things:

a.  The "Loan To Value" rate or amount of the loan to be provided based on the estimated value of the investor's CMOs;

b. The pre-trade distribution amount and net loan proceeds to be invested in the trading platform; and

c. The investor's projected gross earnings per trading tranche of 1.25%, net earnings per tranche, and total net earnings after 200 tranches.

83.     The statements that Geisler, Gunn, SouthCom, Geisco, and FASC made to investors in conversations, emails, the Offering Documents; and that they, Coddington, and Golden Summit made in the exhibits, were false and misleading.  None of the defendants had the ability to successfully hypothecate the investors' CMOs with third party institutions or alternatively to act as a funding source for the program, invest the loan proceeds, and generate trading profits of approximately 250%.  Moreover, Geisler, Gunn, SouthCom, Geisco, and FASC conducted no due diligence on the CMO Trading Program and had no reasonable basis to believe that Golden Summit or Coddington had the ability to do the same.

84.     Between September and November, 2010, Geisler, Gunn, SouthCom, Geisco, FASC, Coddington and Golden Summit convinced at least nine investors to invest $8,657,890 in funds in the CMO Trading Program.

85.     During October 2010, Geisler and Gunn directed some of these investors to send their funds by wire transfers totaling approximately $1,324,982 to Golden Summit's bank account in Colorado.  Out of those funds, Coddington wire transferred: $875,000 to Golden Summit's Viewpoint Securities account and used the funds to purchase a $1 billion face value CMO for approximately $808,000; and $75,000 to Erwin's attorney trust account for Erwin's benefit on November 10, 2010.  Coddington spent the balance of approximately $374,982 for his personal expenses.

86.     But in late October 2010, the bank froze Golden Summit's account because of suspicious transactions.

87.     To continue with the scheme, Coddington asked his attorney, Erwin, to accept deposits of investors' funds directly into Erwin's attorney trust account and then distribute them as Coddington directed.  Erwin agreed to the arrangement.

88.     Erwin had previously served as a broker for Coddington on various investment transactions since at least 2008, and as Coddington's attorney drafted various investment agreements.  Erwin knew that Coddington represented that Golden Summit had developed a funding protocol to use CMOs as collateral for project funding, and that Erwin's role was to receive funds from investors who needed to purchase CMOs for collateral.  Erwin knew from his preparation and review of documents for Golden Summit, and discussions with Coddington, Geisler, and Gunn that investors were sending funds to his attorney trust account solely for purchasing CMOs, which were to be hypothecated and the loan proceeds invested in the CMO Trading Program.

89.     When Erwin received investors' funds into his attorney trust account, he deducted legal and advisory fees, and then forwarded the remaining proceeds to third parties as directed by Coddington.  He knew the misappropriation of investors' funds for his legal fees and distributions to third parties were contrary to the agreements with investors.

90.     During November 2010, Geisler and Gunn directed some of the nine investors to send their funds by wire transfers totaling approximately $7,332,908 to Erwin's trust account. Erwin received an additional wire transfer of $550,000 on December 16, 2010, from another investor that he introduced to the scheme.

91.     Of the $7,882,908 in investors' funds deposited into Erwin's trust account, Coddington directed Erwin to send $4,200,000 to Golden Summit's Viewpoint Securities account during November 2010.

92.     On or about November 24, and 29, 2010, Golden Summit purchased a $1.5 billion face value CMO for approximately $2,400,000 and another CMO with a $250 million face value for approximately $182,000 respectively.  On or about December 3, 2010, Golden Summit purchased a $1 billion face value CMO for approximately $1,475,000.

93.     Contrary to the agreements with investors, Coddington directed Erwin to distribute the balance of investors' funds, approximately $3,682,908, to participants in the scheme during November and December 2010, including:

   a.   $1,805,966.75 to Extreme Capital's bank account in Colorado;

   b.   $500,000 to FASC's bank account in Florida; of that amount, FASC and Gunn transferred $100,000 back to Coddington Trust in Colorado and paid $395,000 to SouthCom for the benefit of Gunn and Geisler;

   c.   $482,000 to Coddington Trust in Colorado;

   d.   $350,000 to Geisco Holdings International LLC for the benefit of Geisler; on the same day, Geisler paid $349,100 to purchase a recreational vehicle;

   e.   $125,000 to a foreign bank account; and

   f.   $368,000 to himself, with the balance of investors' funds paid out of Erwin's trust account for expenses.

94.     Between September and November, 2010, Geisler, Gunn, SouthCom, Geisco, FASC, Golden Summit, and Coddington, using the same false and misleading statements, Offering Documents and exhibits described above in paragraphs 75 through 82, also obtained agreements with three investors, which were entities, to transfer seven CMOs with total face values of approximately $8.3 billion into the CMO Trading Program.

   D.     Leyton Substantially Assisted Coddington and Golden Summit's Fraud

95.     To prepare for these new investments, Coddington emailed Leyton on September 17, 2010, to advise him that "we are getting ready to bring in some additional CMO's

(sic) on repo agreements as well as transfer in cash for purchase [of] about [$]5 B[illion] face value of the same.  Would like to talk with you about that as we want to move forward on that this coming week!  I have approved loans on them as well and will be bringing cash from loan proceeds back for you to work on our behalf."

96.     On or about September 24, 2010, Leyton received a copy of Coddington's September 22, 2010, agreement with Geisler, Gunn, and SouthCom.  The agreement laid out the CMO Trading Program that Coddington was offering to investors and provided Leyton with knowledge about the terms of the CMO Trading Program.

97.     On October 1, 2010, Coddington emailed Leyton that CMOs valued at over $1 billion and along with another $2.3 billion were moving into the Golden Summit Viewpoint Securities account.  He stated, "I have a transaction set up for these on a credit facility basis and I wanted to give you a heads up that this is taking place... all on a repo basis set up by my attorney!" Coddingtons used the term "repo basis" to mean that the CMOs were to be returned to the investor at the conclusion of the loan.  Leyton responded, "Right on! We will need for each of the securities to be delivered . . . [a]ny and all contracts or agreement which can evidence clear ownership or control (no encumbrances)."

98.     Coddington asked Leyton to open brokerage accounts for investors at Viewpoint Securities to enable the investors to transfer the CMOs into Golden Summit's Viewpoint Securities account for hypothecation.  Coddington advised Leyton that "I have 3 [clients] ready to fill out docs and effect transfers [of CMOs] as we speak!  When I have 2.5 B[illion] in current value or more the first loan will be initiated.  Erwin the attorney is putting together the transaction docs for you on [this] first wave of files."

99.     On or about October18, 2010, Leyton opened brokerage accounts for two of the investors referred by Coddington to enable the investors to transfer their CMOs into Golden Summit's Viewpoint Securities account for hypothecation.  To incentivize Leyton for opening the investors' accounts, Coddington paid Leyton $5,000 on the same day, into an account Leyton controlled in the name of Noah Capital LLC.

100.     Contrary to the agreements with investors which provided that the CMOs would remain in Golden Summit's Viewpoint Securities account, Coddington requested that Leyton transfer the first investor's CMOs from the Golden Summit's account to the account of a third-party on November 1, 2010.

101.     On November 2, 2010, Leyton sent Coddington information from the Bureau of Prison's website that the owner of this third-party account appeared to have a criminal record.  In spite of this information, Coddington directed Leyton to proceed with the transfer.  To incentivize Leyton for making the transfer, Coddington paid him $6,500 on November 4, 2010.

102.     On November 19, 2010, Coddington and Golden Summit directed Leyton to sell $1 billion in face value of another investor's CMOs.  Leyton knew, or was reckless in not knowing, that these sales were contrary to Coddington's agreements to hold investors' CMOs in Golden Summit's Viewpoint Securities account as collateral for a loan to be made by Golden Summit.  Leyton sold the CMOs for approximately $1,007,851.66 and received a commission of approximately $45,000.  On the same day, Coddington also paid Leyton $4,975 from Golden Summit's JP Morgan bank account.

E.      Coddington, Gunn, Geisler, and Erwin Concealed the Ongoing Fraud by Making
         Lulling Statements and Payments to Investors

103.     By November 2010, the defendants had failed to make the promised pre-trade

distribution payments to the investors who had invested funds or the seven CMOs in the CMO

Trading Program.

104.     On or about November 26, 2010, Gunn telephoned a representative for one of the

entity investors and told him, based on Gunn's discussions with Coddington and Erwin, that the

pre-trade distribution payment was late because hypothecation of the CMOs was delayed and the

advance payments would be delayed until the middle of the week of December 6, 2010.  Gunn

knew, or was reckless in not knowing, that these statements were false.

105.     On or about December 7, 2010, Gunn telephoned the same representative of one

of the entity investors and told him there had been further delays in obtaining the funding, but

that they would wire $100,000 to him as part of the promised pre-trade distribution, with the

balance to be wired the next week.  Gunn knew, or was reckless in not knowing, that these

statements were false.

106.     On or about December 7, 2010, Erwin, at Coddington's direction, telephoned an

attorney for another of the entity investors and offered the choice between accepting $100,000 of

the promised pre-distribution payment with the rest of the money to be available on

December 10, 2010, or the return of the CMOs.  Erwin knew, or was reckless in not knowing,

that these statements were false.

107.     Each of the entity investors accepted the $100,000 partial payment of the

promised distribution.  To cover the payments, Coddington transferred $250,000 from the

$1,007,851.66 in proceeds from the sale of one entity investor's CMOs discussed in paragraph

102 above into Golden Summit's bank account on December 8, 2010.  Then, on December 9,

2010, Coddington transferred $200,000 to Erwin's trust account, and used the remaining $50,000 for his personal expenses.

108.     At Coddington's direction, Erwin paid $100,000 each to the two entity investors that invested CMOs in the Trading Program.

109.     Contrary to Erwin's and Gunn's statements that the $100,000 paid to each entity investor was part of the pre-trade distribution, these funds came from Coddington's unauthorized sale of the investors' own CMOs, rather than loans from the hypothecation of the CMOs.  As of December 8, 2010, Golden Summit and Coddington had not hypothecated any CMOs or obtained any loan proceeds, and had not made any investments through a trading platform.

110.     On or about December 14, 2010, Geisler and Gunn made additional lulling statements to the two entity investors.  Geisler and Gunn falsely stated in emails sent to the two entity investors, "We have been advised that the funds have been wired from the hypothecating attorney's account to the attorney for Golden Summit's escrow account.  The wire is in excess of $10 Million and so is making its way through the various channels.  We anticipate having a letter to each of you from the Golden Summit attorney later today."  Geisler and Gunn had no reasonable basis for these false statements.

111.     On or about December 14, 2010, Gunn drafted letters for Erwin to sign, which advised the investors that the pre-trading distributions had again been delayed.  Gunn sent the draft letter to Coddington, Erwin, and Geisler for review.  Erwin signed the letters without substantive change and sent copies to Coddington, Geisler and Gunn for distribution to the investors.  In each letter, Erwin wrote, "my law firm is responsible for facilitation of the wire transferring of funds in the amount $[ ], representing your pre-investment distribution" and entered the pre-trade distribution amount owed to each investor.  He also wrote, "[t]he funds that

are forthcoming are being sent from an offshore Attorney Escrow account and unfortunately were not wired by the sending bank last Friday as we were told." In each letter, he agreed to notify Geisler and Gunn as soon as the funds were posted to his account.

112.    Erwin's letters to the investors were false and misleading because Erwin had no reasonable basis for stating the funds would be forthcoming from an offshore attorney's escrow account, because in fact there was no offshore attorney's escrow account and no funds had been wired to him.

113.    In furtherance of the scheme, Coddington, Erwin, Geisler and Gunn used the December 14, 2010, letters as deceptive devices to delay the investors' demands for return of their CMOs.

F.    Coddington Enlisted Stonerock and Columbia to Join the Scheme to Liquidate CMOs

114.    By early December, 2010, Coddington and Golden Summit had failed to comply with their agreements to hypothecate any CMOs to obtain loans for investment in the CMO Trading Program. They were facing increasing demands from the investors for payment of the pre-trade distributions, proof of hypothecation, or return of the investors' CMOs. Contrary to the agreements with investors to hold the CMOs in Golden Summit's Viewpoint Securities account for hypothecation, Coddington and Golden Summit began to look for a third party to whom they could transfer the remaining CMOs for liquidation.

115.    Coddington identified BAWA Financial Ltd. ("BAWA") as an entity that could receive and liquidate the CMOs. Columbia was a director of BAWA.

116.    To create the appearance of a legitimate transaction, Coddington and Golden Summit entered into three sham agreements with BAWA (hereinafter referred to as "the BAWA agreements") between December 4 and 12, 2010. In these agreements, among other things,

Coddington and Golden Summit agreed to transfer CMOs with face values of approximately $11.2 billion to the brokerage account of Stonerock that was controlled by Columbia, which was to hypothecate the CMOs to generate a loan of approximately $1.1 billion and pay a pre-trade distribution of $63 million to Golden Summit. The balance of the loan proceeds purportedly were to be invested in a trading platform with profits to be shared fifty-fifty between Golden Summit and BAWA.

117.    On or about December 7, 2010, Coddington instructed Leyton and Viewpoint Securities to deliver eight CMOs with a total face value of $11.2 billion from Golden Summit's Viewpoint Securities account to Stonerock's brokerage account. These CMOs had been obtained from investors or purchased using investors' funds raised in connection with the CMO Trading Program.

118.    Leyton acted upon Coddington's instructions even though he knew from discussions with Coddington and his receipt of documents that investors provided the CMOs to be held in Golden Summit's Viewpoint Securities account for hypothecation and then returned to investors.

119.    Ultimately, Columbia and Stonerock never hypothecated any of the CMOs to obtain a loan for Golden Summit as required under the sham BAWA agreements. Instead, Columbia almost immediately began selling the CMOs for his own benefit and for the benefit of Coddington and Golden Summit.

120.    Between on or about December 14, 2010 and July 30, 2011, Columbia and Stonerock sold the CMOs with face values of approximately $11.2 billion for approximately $3.4 million.

121.    Beginning in January 2011, shortly after Columbia started liquidating the CMOs, he began making payments to Coddington and Golden Summit out of the CMO sales proceeds. Coddington did not disclose these payments to investors.

    a.    For example, on January 20, 2011, Columbia withdrew $93,287.97 in cash from the Stonerock's Wells Fargo account and deposited $93,287.97 into Golden Summit's Wells Fargo bank account, which was controlled by Coddington;

    b.    On January 21, 2011, Columbia withdrew $100,000 in cash from Stonerock's Wells Fargo bank account, and deposited $100,000 into Golden Summit's Wells Fargo bank account; and

    c.    On February 11, 2011, Columbia withdrew $78,000 in cash from Stonerock's Wells Fargo bank account, and deposited $75,000 into Golden Summit's Wells Fargo bank account.

122.    Additionally, Columbia made payments to his wife, Joanna Columbia.  Between on or about December 15, 2010, and July 30, 2011, Columbia transferred approximately $3.2 million from Stonerock's brokerage account to Stonerock's bank account for the personal benefit of his wife.

G.    Columbia Provided False Information to Coddington and Erwin Which They Used to Lull Investors through Geisler and Gunn

123.    During December 2010 and January 2011, Columbia and Stonerock provided false information to Coddington and Erwin making it appear that Columbia was complying with the stated terms of the sham BAWA agreements to hypothecate the CMOs when in fact they were not.  Coddington and Erwin used the false information they obtained from Columbia to lull investors by passing the information along to them, through Geisler and Gunn, without confirming whether the information was accurate.

124.    For example, on or about December 17, 2010, Columbia prepared a fictitious letter that purportedly directed his brokerage firm, Morgan Stanley, to wire approximately $63 million to Erwin's trust account for the benefit of Golden Summit as the advance payment due

under the BAWA agreements. In fact, Columbia and Stonerock did not have $63 million in funds. As part of the scheme, Columbia sent a redacted copy of the fictitious letter to Erwin and Coddington, who used the letter to delay investors' requests for payment without conducting any investigation to determine if the letter was valid.

125.    On or about December 18, 2010, Erwin told Geisler and Gunn that Erwin's bank had received an instruction letter and clearance to credit his bank account with the $63 million. Erwin had no reasonable basis for this false statement. Erwin provided the false information to Geisler and Gunn knowing that it would be passed along to investors.

126.    On or about December 29, 2010, Erwin sent an email to Gunn, Geisler, and SouthCom, with a copy to Coddington, falsely confirming that funds had been sent to Golden Summit and that he expected outgoing wires to investors the next morning. Erwin had no reasonable basis for this false statement. Erwin provided the false information to Geisler and Gunn knowing that it would be passed along to investors.

127.    On or about January 21, 2011, Columbia sent an email to Erwin stating that he had received an incoming wire, and attached a computer screen shot of a Wells Fargo bank account statement falsely showing a deposit of approximately $111 million on January 21, 2011. Columbia had fabricated the bank statement.

128.    On January 31, 2011, Erwin sent an email to Geisler attaching the Wells Fargo bank statement he had received from Columbia. Erwin falsely represented in the email that, "This letter shall serve as confirmation that the Wells Fargo redacted account statement that you have been provided references a pending wire transfer … of $111,431,769.94. $63MM of said wire transfer belongs to my client Golden Summit . . . and from said $63MM USD, you are to

receive $43MM USD." Erwin had no reasonable basis for these false statements.   Erwin provided the false information to Geisler knowing that it would be passed along to investors.

  H. <u>Leyton Ignored Investors' Complaints</u>

  129. In March 2011, two investors each alerted Leyton to concerns about their dealings with Geisco and Golden Summit after the defendants failed to deliver on their promises.  On or about March 3, 2011, the first investor provided Leyton with a copy of her contract with Geisco supporting her claim that she had provided Golden Summit with $250,000 to purchase CMOs for hypothecation.  Similarly on or about March 10, 2011, the second investor provided documents to Leyton that supported his claims that his funds were transferred to Golden Summit's Viewpoint Securities account.

  130. Leyton took no meaningful action to investigate the investors' complaints concerning their providing funds or securities to Golden Summit, what Golden Summit did with those funds or securities, or why Golden Summit failed to hypothecate the CMOs.  On or about March 17, 2011, and despite the concerns raised by the investors, Leyton approved a wire transfer of $19,000 from Golden Summit's Viewpoint Securities account to a Golden Summit bank account.  The next day, Golden Summit wired $5,000 from the same Golden Summit bank account to Leyton's Noah Capital LLC account.

  I. <u>Coddington and Erwin Continued the Scheme with another Investor</u>

  131. In the spring of 2011, Coddington and Erwin continued to offer investments in a variation of the CMO Trading Program using false and misleading statements.

  132. To assist Coddington with these transactions, Leyton opened a second brokerage account for Golden Summit at Viewpoint ("Golden Summit Viewpoint II account").  Leyton

opened the account although he had received at least three investors' complaints about Golden Summit and Coddington not performing on their investor agreements.

133.    In or about April 2011, Golden Summit, Coddington and Erwin were introduced to an entity investor.  In or about April 2011, Coddington and Erwin held a telephone conference call with the principals of the investor.  During the telephone call, Coddington and Erwin offered an investment wherein they would use $9 million from the investor to purchase six CMOs that Golden Summit would pledge as collateral for a loan of $60 million for the investor's benefit.

134.    Coddington, Erwin and Golden Summit misrepresented that Golden Summit would hypothecate the CMOs itself and make a $60 million loan from its own credit lines to the investor.  Coddington failed to disclose that Golden Summit had never successfully hypothecated a CMO and that he and others in the scheme had misappropriated funds.  Coddington knew, and Erwin knew, or was reckless in not knowing, that Golden Summit did not have the financial ability to make a loan of $60 million or to otherwise hypothecate the CMOs.

135.    To allay the investor's concerns about Golden Summit's ability to perform the transaction, Erwin sent a misleading letter on April 19, 2011, to the investor responding to its questions about a lawsuit that was previously filed against Golden Summit.  He stated that "Coddington has an earned reputation for excellence and veracity of the highest nature in the financing world. . . .   He does what he says he will do and he does it without excuses or complaint.  Mr. Coddington is ready to produce the results that you seek for your particular financing matter."  Erwin failed to disclose the material facts that he knew about Coddington having not performed on multiple transactions during 2010 and 2011.

136.    On or about April 20, 2011, Coddington as the CEO and Erwin as the attorney for Golden Summit entered into formal agreements with the investor to consummate the investment.

137.     On or about April 20, 2011, the investor sent a wire transfer of $9 million to Golden Summit's bank account for the purchase of CMOs under the agreements.

138.     On or about April 21, 2011, Coddington transferred $7 million of the investor's funds to Golden Summit's Viewpoint II account.

139.     On or about April 25, 2011, Coddington and Golden Summit purchased CMOs for approximately $6.2 million.  Coddington misappropriated the remaining investor funds of approximately $2.8 million.

140.     On or about April 26, 2011, Coddington and Golden Summit sent the investor false confirmations representing that the purchase price of the CMOs was a total of $9 million, and that the hypothecation amount of $60 million was to be paid in three banking days, despite the fact that the purchase price of the CMOs was only approximately $6.2 million and Coddington had misappropriated the balance of the funds.

141.     Because Coddington and Golden Summit did not have the ability to fulfill the terms of its agreement to make a loan of $60 million, they entered into another sham agreement with BAWA purportedly to hypothecate the CMOs.

142.     On or about April 28, 2011, Coddington requested that Leyton transfer the CMOs that it had purchased for the investor from Golden Summit's Viewpoint II account to BAWA's brokerage account at Viewpoint.

143.     To assist Coddington, Leyton prepared a letter stating, "The following securities will be posting to the credit facility account today, April 28, 2011."  Coddington sent Leyton's letter to the investor to make it appear that he had hypothecated the CMOs by transferring them to BAWA.

144.    When sending Leyton's letter, Coddington did not disclose material facts to the investor about his previous agreements with BAWA; that Stonerock and Columbia had sold investors' CMOs; and that Columbia and Coddington misappropriated the sales proceeds.

145.    Subsequently, Viewpoint Securities' clearing broker refused to transfer the CMOs to BAWA's account because it was a foreign third party that recently opened the account. Leyton attempted to overcome the objections and provided assistance to Coddington's transfer of the investor's CMOs to BAWA.  Leyton provided a copy of Golden Summit's agreement with BAWA and misled the clearing broker by stating that "We are facilitating the transfer as an accommodation of Golden Summit as they are a customer of the firm.  The only compensation we have received is in the form of commissions from the sale of securities to Golden Summit." Leyton did not disclose his arrangement with Coddington to receive undisclosed compensation in addition to his brokerage commissions.  Leyton was unsuccessful in transferring the CMOs to BAWA.

146.    When Golden Summit and Coddington were unable to transfer the CMOs to BAWA, they then directed Leyton to sell the CMOs to BAWA for approximately $33,095.17, which was a fraction of the purchase price of approximately $6.2 million.  The transaction took place on or about May 4, 2011.

147.    At Coddington's request, on or about May 5, 2011, Leyton wrote a letter to Coddington falsely confirming that as of April 29, 2011, the transfer of the CMOs from Golden Summit to BAWA was completed.  In fact, Leyton had effected a sale of the CMOs rather than a transfer the previous day.

148.    Erwin used Leyton's letter to lull the investor's concerns about the delays in receiving the $60 million loan that Erwin and Coddington had promised them.  On May 6, 2011,

Erwin sent an email with Leyton's May 5, 2011 letter to the investor confirming the transfer of the CMOs.  Erwin stated "I will have confirmation sometime tomorrow regarding the timing for the funds release.  I will call you as soon as I receive word on the disbursement of funds."  Erwin had no reasonable basis to believe there would be any funding release from BAWA.

149.     On or about May 17, 2011, the investor requested that Golden Summit, Coddington and Erwin provide documentation on the status of the funding.  In response, Coddington sent the investor a copy of BAWA's May 18, 2011 letter, which stated BAWA had entered into an agreement with Golden Summit to provide loan financing using the CMOs provided by Golden Summit as collateral.  Coddington knew this letter was false, and provided it to the investor as a deceptive device to delay the investor's request for return of its CMOs.  Coddington knew he had sold rather than pledged the CMOs as collateral, and that BAWA had not provided any loan financing to Golden Summit.

150.     On or about June 2, 2011, the investor filed a formal claim of ownership with Leyton and Viewpoint, advising that Golden Summit did not have authority to transfer its CMOs to BAWA.  The investor also sent a demand letter to Golden Summit for return of the CMOs.

151.     However, Coddington, Erwin, Golden Summit, and BAWA did not return the CMOs to the investor.

J.     Malouf Offered Investments through Extreme Capital in the CMO Trading Program during 2011

152.     During 2011, Malouf and Extreme Capital offered variations of the CMO Trading Program to at least two investors.

The Florida LLC Investor

153.     In or about January 2011, Malouf and Coddington participated in a telephone conference call during which they solicited a possible investor that was a Florida limited liability

company to participate in a version of the trading program.  But at that time, the investor refused to enter into the transaction.

154.    In or about March 2011, Malouf offered the CMO Trading Program through Coddington's entity, Extreme Capital, to the investor again.  Malouf falsely represented that:

a.  Extreme Capital would hypothecate the CMO through Golden Summit for 4% of the market value or approximately $36 million in funds;

b.  Golden Summit would pay $1 million to the investor within 10 days plus broker's fees, and provide approximately $32 million as a loan for investment in the trading platform;

c.  Extreme Capital and Malouf would conduct 105 trades over a one-year period, with 10% profit to be made on each trade and a total of $500 million earned; and

d.  The $500 million in initial trading profits would be taken to Europe to be invested in a second trading platform, with the expected earnings to be $10 billion.

155.    Malouf knew, or was reckless in not knowing, that his statements about the CMO Trading Program during the two solicitations were false and misleading.  Extreme Capital and Golden Summit did not have the financial ability to perform under the terms of the purported investment.

156.    In furtherance of the scheme, Malouf used a new letter from Erwin to bolster his offer to the investor.  On or about March 20, 2011, Malouf emailed the investor the letter in which Erwin falsely stated that the CMOs' documents had been submitted to the funding source, which had funds available for the program, and that the CMOs were approved for funding.  Erwin also stated that if Extreme Capital was unable to hypothecate the CMOs, they would be returned immediately to the investor's brokerage account.  Both Malouf and Erwin knew, or were reckless in not knowing, that the statements in the letter were false.

157.    On or about May 25, 2011, Malouf, on behalf of Extreme Capital, and the investor signed an investment agreement.

158.     To facilitate the transfer of the investor's CMOs to Golden Summit, either Malouf or Coddington introduced the investor to Leyton, who opened a brokerage account for the investor at Viewpoint Securities on or about May 26, 2011.

159.     On or about June 14, 2011, the investor transferred $1 billion in face value of CMOs to Golden Summit's Viewpoint Securities account.

160.     Between June, and October, 2011, Golden Summit received at least $53,867 in interest payments from the investor's CMOs.  On or about October 10, 2011, the investor's CMOs were delivered out of Golden Summit's Viewpoint Securities account to a third party.

161.     Contrary to the terms of the agreement with the investor, Extreme Capital, Malouf, Golden Summit and Coddington never hypothecated the investor's CMOs, never obtained a loan, and never invested any funds in a trading platform.  They also did not return the CMOs to the investor.

### The Michigan LLC Investor

162.     In or about June 2011, Malouf and Extreme Capital offered Golden Summit's CMO Trading Program to another investor, a Michigan limited liability company.

163.     On or about June 17, 2011, Extreme Capital and Malouf agreed to hypothecate this investor's CMOs with Golden Summit, which was to provide a loan of approximately $32 million.  Malouf falsely represented that the investor's CMOs would be transferred to a brokerage account of Golden Summit for hypothecation, and the line of credit would become available within two weeks.  Malouf represented that if Golden Summit was not able to hypothecate the CMOs, it would immediately return the CMOs.  Malouf failed to disclose that Extreme Capital, Malouf, Golden Summit and Coddington did not have the ability to hypothecate the CMOs and obtain loan proceeds of approximately $32 million.

164.    On July 8, 2011, the investor transferred the CMOs from its brokerage account to Golden Summit's Viewpoint Securities account.

165.    On or about July 11, 2011, Malouf emailed the investor that the CMO had arrived in the account of the funding source and had cleared so they could commence the hypothecation process and make distribution in one week.

166.    On August 3, 2011, Malouf sent an email to the investor stating that "Scott [Coddington] met with the 'bankers and funding sources this afternoon.' He needs to return in the morning to sign all of the updated Funding Agreements. . . . The target is to have the Funding Bank release the funds for our use on Friday [August 5, 2011]."

167.    In fact, Scott Coddington had not met with any bankers or funding sources to provide a loan on the investor's CMOs.

168.    On or about August 5, 2011, Golden Summit received $2,422 in interest from the investor's CMO.

169.    On or about August 5, 2011, Golden Summit transferred the investor's CMOs from its Viewpoint account to a third party.

170.    On or about November 3, 2011, the investor sent an email to Extreme Capital and Malouf demanding the return of the CMOs and past interest payments.

171.    Extreme Capital, Malouf, Golden Summit and Coddington did not return the investor's CMOs or interest.

K.    The Use and Misappropriation of Investors' Funds and Assets during the Scheme

172.    In total, the Defendants raised approximately $18.2 million in investors' funds and $14.9 billion in face value of CMOs. Coddington used $11.2 million of investors' funds to purchase additional CMOs along with CMOs provided by investors, which were then liquidated

or transferred, for net proceeds of approximately $3.4 million.  The meager proceeds from the liquidation of CMOs, combined with the unused investors' cash, left approximately $10.4 million.  Ultimately, these investors' funds were either misappropriated by the proposed defendants or transferred to the proposed relief defendants.

173.    Coddington misappropriated approximately $3 million in investors' funds, CMO interest payments, and payments from Columbia (from the liquidation of CMOs).  After receiving investors' funds from Erwin's trust account, Coddington made significant cash withdrawals from Golden Summit's bank and securities accounts.  He transferred additional investors' funds from Golden Summit to his personal bank accounts and other bank accounts that he controlled.  Coddington used at least $234,245 of investors' funds to purchase seven automobiles, and he spent lavishly on restaurants, entertainment and travel.

174.    Erwin misappropriated at least $800,000 in investors' funds, most of which he transferred directly from his attorney trust account to his personal bank accounts.  Erwin used investors' funds for restaurants, entertainment and to lease a condo near Las Vegas.

175.    Malouf received approximately $77,000 in misappropriated investors' funds.  Coddington wired funds from Golden Summit's bank account to Malouf's personal bank account.  Malouf used investors' funds for restaurants, automobile expenses and travel.

176.    Leyton received approximately $86,000 in misappropriated investors' funds.  He also received commissions of at least $45,000 from the improper sale of investors' CMOs from Golden Summit's brokerage account.  Leyton used these investors' funds for restaurants, entertainment, travel and clothing.

177.    Geisler received approximately $456,000 in misappropriated investors' funds.  Erwin wired investors' funds from his trust account to bank accounts controlled by Geisco and

Geisler.  Geisler purchased a $349,000 recreational vehicle and a high-end automobile for more than $105,000.

178.    Gunn received approximately $400,000 in misappropriated investors' funds. Erwin wired investors' funds from his trust account to bank accounts controlled by FASC and Gunn.

179.    Columbia and Relief Defendant Joanna Columbia misappropriated approximately $3.4 million in proceeds from the liquidation of investors' CMOs and CMOs' interest payments from December 2010 to July 2011.  A significant portion of these funds was transferred to bank accounts under Joanna Columbia's control.  During this time, Michael and Joanna Columbia often spent in excess of $10,000 in a single night at restaurants and clubs.  They also used investors' funds to maintain a penthouse apartment in Chicago and a house in the Phoenix area. Joanna Columbia provided no consideration for the funds she received from the defendants.

180.    Relief Defendant Coddington Trust received almost $945,000 in investors' funds from Extreme Capital's bank account for the purchase of a house in the name of the trust.  This residence was subsequently sold.  Additional investors' funds were transferred to the Coddington Trust from Erwin's trust account, the Golden Summit bank account, and other Coddington-controlled bank accounts.  Coddington Trust provided no consideration for the funds it received from the defendants.

181.    Relief Defendant Scott Coddington received at least $640,000 in investors' funds. The funds were originally sent by investors to Erwin's trust account and then, through a series of transfers through Extreme Capital and Coddington Trust from November 2010 to July 2011, were transferred into bank accounts over which Scott Coddington had authority to withdraw funds.  Once investors' funds were in bank accounts he controlled, Scott Coddington used the

funds for significant cash withdrawals, restaurants, entertainment, electronics and jewelry. Scott Coddington provided no consideration for the funds he received from the defendants.

182.    Relief Defendants Farris Co. and Farris received approximately $625,000 in investors' funds from Golden Summit; and Farris received approximately $40,000 in investors' funds from Erwin. Farris Co. and Farris provided no consideration for the funds they received from the defendants.

L.    Defendants' Respective Roles in the Fraudulent Scheme

183.    As alleged herein, Coddington orchestrated the scheme to defraud and in furtherance thereof, he committed the following deceptive acts, including but not limited to:

   a.  Coddington made false and misleading statements, and failed to disclose information, to investors regarding the investments offered in the CMO Trading Program;

   b.  Coddington provided false and misleading information about the CMO Trading Program both orally and in writing to Malouf, Geisler, and Gunn to be provided to investors that were interested in investing in the CMO Trading Program;

   c.  Coddington used investors' funds to purchase CMOs and received CMOs from investors but failed to hypothecate the CMOs, provide distributions to investors, and failed to invest any funds in an equities trading platform;

   d.  Coddington misappropriated investors' funds for his personal benefit;

   e.  Coddington used investors' CMOs for his own personal benefit by misappropriating interest that was due under the terms of the bonds and by selling CMOs in order to misappropriate the proceeds;

   f.  Coddington made lulling statements to investors, directly or indirectly through others, to prevent investors from seeking a return of funds or CMOs, or from contacting regulatory authorities;

   g.  Coddington directed other defendants in the scheme to perform acts in furtherance thereof, such as directing the transfer of investors' funds and CMOs for the defendants' own personal uses; and

   h.  Coddington caused investors' funds to be paid to defendants and relief defendants.

184.    As alleged herein, at various times Coddington acted in the name of and through his entities, Golden Summit and Extreme Capital.  By virtue of Coddington's conduct, Golden Summit and Extreme Capital are liable as participants in the scheme to defraud.

185.    As alleged herein, Malouf participated in the scheme to defraud by soliciting investors to invest in the CMO Trading Program, and in furtherance of the scheme, he committed the following deceptive acts, including but not limited to:

    a.    Malouf made false and misleading statements, and failed to disclose information, to investors regarding investments in the CMO Trading Program;

    b.    Malouf provided false and misleading information about the CMO Trading Program both orally and in writing to Geisler and Gunn to be provided to investors that were interested in investing in the CMO Trading Program;

    c.    Malouf made false and misleading lulling statements to investors, directly or indirectly through others, to prevent investors from seeking a return of funds or CMOs, or from contacting regulatory authorities; and

    d.    Malouf received and spent investors' funds for his personal benefit.

186.    As alleged herein, Geisler participated in the scheme to defraud by soliciting investors to invest in the CMO Trading Program, and in furtherance of the scheme, he committed the following deceptive acts, including but not limited to:

    a.    Geisler made false and misleading statements, and failed to disclose information, to investors regarding investments in the CMO Trading Program;

    b.    Geisler made false and misleading lulling statements to investors to prevent them from seeking a return of funds or CMOs, or from contacting regulatory authorities; and

    c.    Geisler received and spent investors' funds for his personal benefit.

187.    As alleged herein, Gunn participated in the scheme to defraud by soliciting investors to invest in the CMO Trading Program, and in furtherance of the scheme, he committed the following deceptive acts, including but not limited to:

    a.   Gunn made false and misleading statements, and failed to disclose information, to investors regarding investments in the CMO Trading Program;

    b.   Gunn made false and misleading lulling statements to investors to prevent them from seeking a return of funds or CMOs, or from contacting regulatory authorities; and

    c.   Gunn received and spent investors' funds for his own personal benefit.

188.    As alleged herein, at various times Geisler and Gunn acted in the name of and through their entities; SouthCom, FASC, and Geisco.  By virtue of Geisler's and Gunn's conduct, SouthCom, FASC, and Geisco are each liable as participants in the scheme to defraud.

189.    As alleged herein, Erwin participated in the scheme to defraud, and in furtherance thereof, committed the following deceptive acts, including but not limited to:

    a.   Erwin made false and misleading statements, and failed to disclose information, to investors regarding investments in the CMO Trading Program;

    b.   Erwin received investors' funds into his attorney trust account and distributed those funds at Coddington's direction for the benefit of participants in the scheme;

    c.   Erwin received and spent investors' funds for his personal benefit;

    d.   Erwin executed an investment agreement as the attorney of record for Golden Summit; and

    e.   Erwin made false and misleading lulling statements to investors, directly or indirectly through others, to prevent investors from seeking a return of funds or CMOs, or from contacting regulatory authorities.

190.    As alleged herein, Leyton aided and abetted the scheme to defraud, and in furtherance thereof, provided the following substantial assistance, including but not limited to:

    a.   Leyton opened brokerage accounts to enable investors to transfer their CMOs to the defendants to invest in the purported CMO Trading Program;

    b.   Leyton transferred CMOs out of brokerage accounts at Viewpoint Securities contrary to agreements between defendants and investors;

    c.   Leyton helped delay the return of CMOs to investors;

    d.   Leyton ignored investors' complaints;

    e.   Leyton provided false information to third parties;

    f.   Leyton facilitated the liquidation of investors' CMOs;

    g.   Leyton facilitated Coddington's misappropriation of CMOs' interest; and

    h.   Leyton received and spent investors' funds for his personal benefit.

191.    As alleged herein, Columbia aided and abetted the scheme to defraud, and in furtherance thereof, provided the following substantial assistance, including but not limited to:

    a.   Columbia liquidated CMOs contrary to agreements between defendants and investors;

    b.   Columbia used proceeds from the sales of CMOs for his personal benefit and made payments of proceeds for the benefit of his wife;

    c.   Columbia paid proceeds from the sale of CMOs back to Coddington and to others at Coddington's direction; and

    d.   Columbia provided false information to other defendants that they used to make false and misleading lulling statements to investors.

192.    As alleged herein, at various times Columbia acted in the name of and through his entity, Stonerock.  By virtue of Columbia's conduct, Stonerock aided and abetted the fraudulent scheme.

## REGISTRATION VIOLATIONS

193.    Coddington, Geisler, Gunn, Malouf, Golden Summit, Extreme Capital, SouthCom, and Geisco, offered and sold investment contracts in the CMO Trading Program which are securities.  In addition, these defendants solicited investors' funds which were used to purchase CMOs, which are securities in the form of bonds.

194.     Investors pooled their funds or CMOs for participation in the CMO Trading Program with the expectation that they would receive profits from the efforts of Golden Summit, Coddington, Extreme Capital, Malouf, SouthCom, Geisco, Geisler or Gunn.

195.     These defendants offered and sold the securities by means of interstate commerce by placing telephone calls, sending emails and requesting wire transfers of funds or securities.

196.     During 2010 and 2011, no registration statement was filed or in effect with the SEC for the defendants' offers or sales of CMOs or investments in the CMO Trading Program.

**BROKER-DEALER REGISTRATION VIOLATIONS**

197.     From at least January 1, 2010, Coddington, Geisler, Gunn, Malouf, Golden Summit, Extreme Capital, SouthCom and Geisco engaged in the business of inducing or attempting to induce the purchase or sale of securities relating to the CMO Trading Program.

198.     Coddington, Geisler, Gunn, Malouf, Golden Summit, Extreme Capital, SouthCom and Geisco each used interstate commerce, sending emails and speaking by telephone with investors about the CMO Trading Program.

199.     Coddington, Geisler, Gunn, Malouf, Golden Summit, Extreme Capital, SouthCom and Geisco each were to receive transaction-based compensation.

200.     Coddington, Geisler, Gunn, Malouf, Golden Summit, Extreme Capital, SouthCom and Geisco were not registered as brokers or dealers, or associated with a broker-dealer registered with the SEC while they induced or attempted to induce the purchase or sale of securities.

**FIRST CLAIM FOR RELIEF**
**Offer and Sale of Unregistered Securities**
**In Violation of Sections 5(a) and 5(c) of the Securities Act**
**[15 U.S.C. §§ 77e (a) and 77e(c)]**

201.    Paragraphs 1 through 200 are hereby realleged and incorporated by reference.

202.    The investments that defendants offered and sold in the CMO Trading Program and the CMOs that the defendants offered to purchase or invest in the CMO Trading Program, are "securities" as that term is defined in Section 2(a)(1) of the Securities Act and Section 3(a)(10) the Exchange Act, 15 U.S. C. §§ 77b(a)(1) and 78c(a)(10).

203.    Coddington, Geisler, Gunn, Malouf, Golden Summit, Extreme Capital, SouthCom, and Geisco, directly or indirectly, singly or in concert, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities through the use or medium of a prospectus or otherwise, or caused to be carried through the mails or in interstate commerce by any means or instruments of transportation, securities for the purpose of sale or for delivery after sale when no registration statement was in effect as to those securities.

204.    Coddington, Geisler, Gunn, Malouf, Golden Summit, Extreme Capital, SouthCom and Geisco, directly or indirectly, singly or in concert, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy securities through the use or medium of a prospectus or otherwise, when no registration statement had been filed for those securities.

205.    By virtue of this conduct, Coddington, Geisler, Gunn, Malouf, Golden Summit, Extreme Capital, SouthCom and Geisco have each violated and, unless restrained and enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act , 15 U.S.C. §§ 77e(a) and 77e(c).

## SECOND CLAIM FOR RELIEF
### Fraud – Violations of Securities Act Section 17(a)
### [15 U.S.C. § 77q(a)]

206.    The SEC realleges paragraphs 1 through 200 above.

207.    Coddington, Erwin, Geisler, Gunn, Malouf, Golden Summit, Extreme Capital, SouthCom, Geisco, and FASC, directly and indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails:  (a) employed a device, scheme, or artifice to defraud with scienter; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices, or courses of business which have been or are operating as a fraud or deceit upon the purchasers of the securities.

208.    Columbia, Leyton, and Stonerock aided and abetted violations of Securities Act Section 17(a) by Coddington and Golden Summit.

209.    Alternatively, Coddington and Erwin aided and abetted violations of Securities Act Section 17(a) by Geisler, Gunn, Malouf, FASC, Geisco, and SouthCom.

210.    By virtue of this conduct, Coddington, Columbia, Erwin, Geisler, Gunn, Leyton, Malouf, Golden Summit, Extreme Capital, SouthCom, Geisco and Stonerock violated, or aided and abetted violations, and unless restrained and enjoined will in the future violate, or aid and abet violations of, Securities Act Section 17(a), 15 U.S.C. § 77q(a).

## THIRD CLAIM FOR RELIEF
### Fraud – Violations of Exchange Act Section 10(b) and Rule 10b-5
### [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]

211.    The SEC realleges paragraphs 1 through 200 above.

212.    Coddington, Erwin, Geisler, Gunn, Malouf, Golden Summit, Extreme Capital, SouthCom, Geisco, and FASC, directly or indirectly, with scienter, in connection with the

47

purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, the mails, or any facility of a national securities exchange:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person; in violation of Exchange Act Section 10(b) and Rule 10b-5.

213.    Columbia, Leyton, and Stonerock aided and abetted violations of Exchange Act Section 10(b) and Rule 10b-5 by Coddington and Golden Summit.

214.    Alternatively, Coddington and Erwin aided and abetted violations of Exchange Act Section 10(b) and Rule 10b-5 by Geisler, Gunn, Malouf, FASC, Geisco, and SouthCom.

215.    By virtue of this conduct, Coddington, Columbia, Erwin, Geisler, Gunn, Leyton, Malouf, Golden Summit, Extreme Capital, SouthCom, Geisco and Stonerock violated, or aided and abetted violations, and unless restrained and enjoined will in the future violate, or aid and abet violations of, Exchange Act Section 10(b) and Rule 10b-5, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.

### FOURTH CLAIM FOR RELIEF
### Acting As an Unregistered Broker-Dealers
### in Violation of Section 15(a) of the Exchange Act
### [15 U.S.C. § 78o(a)]

216.    Paragraphs 1 through 200 are hereby realleged and incorporated by reference.

217.    In connection with their offer and sale of the securities, Coddington, Geisler, Gunn, Malouf, Golden Summit, Extreme Capital, SouthCom, and Geisco acted as brokers or dealers engaged in the regular business of effecting transactions in securities for the account of others, or buying and selling securities for their own accounts.

218.     Coddington, Geisler, Gunn, Malouf, Golden Summit, Extreme Capital, SouthCom, and Geisco made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of securities while they were not registered with the SEC as a broker-dealer or associated with a broker-dealer.

219.     By virtue of this conduct, Coddington, Geisler, Gunn, Malouf, Golden Summit, Extreme Capital, SouthCom, and Geisco have each violated and, unless restrained and enjoined, will continue to violate Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

### FIFTH CLAIM FOR RELIEF
### Unjust Enrichment of Relief Defendants

220.     Paragraphs 1 through 200 are hereby realleged and incorporated by reference.

221.     Scott Coddington, Coddington Trust, Joanna Columbia also known as Joanna I. Ornowska, Farris Co., and Farris obtained funds as part, and in furtherance of the securities violations alleged above without a legitimate claim to the funds, and under those circumstances it is not just, equitable or conscionable for them to retain the funds.

222.     Scott Coddington, Coddington Trust, Joanna Columbia also known as Joanna I. Ornowska, Farris Co., and Farris were unjustly enriched.

223.     By virtue of this conduct, Scott Coddington, Coddington Trust, Joanna Columbia also known as Joanna I. Ornowska, Farris Co., and Farris should be ordered to disgorge the funds they received as a result of the defendants' violations of the federal securities laws.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Find that the Defendants, and each of them, committed the violations alleged.

### II.

Enter an Order of Permanent Injunction as to each defendant, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, enjoining each defendant from further violations of the provisions of law and rules alleged in this Complaint.

### III.

Enter an Order requiring the defendants and relief defendants to prepare an accounting of the proceeds they obtained from the offers and sales of the CMOs.

### IV.

Enter an Order requiring defendants to disgorge all ill-gotten gains resulting from their participation in the conduct described above, including pre-judgment and post judgment interest.

### V.

Enter an Order requiring all defendants to pay third-tier civil penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act, 15 U.S.C. §§ 77t(d) and 78u(d)(3).

### VI.

Enter an Order requiring Scott Coddington, Coddington Trust, Joanna Columbia also known as Joanna I. Ornowska, Farris Co., and Farris to disgorge funds that they received that were the proceeds of illegal activities of other defendants.

## VII.

Grant such further equitable relief as this Court deems appropriate and necessary.

Dated:  December 12, 2013.

Respectfully submitted,

s/ Leslie J. Hughes
Leslie J. Hughes
Colorado Bar No. 15043

Attorney for the United States
Securities and Exchange Commission
Denver Regional Office
1801 California Street, Suite 1500
Denver, CO  80202-2656
Telephone: 303-844-1000
Fax: 303-844-1068
E-mail: HughesLJ@sec.gov