IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13–cv–03363–CMA–KMT

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

v.

DANIEL DIRK CODDINGTON,
MICHAEL B. COLUMBIA,
JESSE W. ERWIN, JR.,
MERLYN CURT GEISLER,
MARSHALL D. GUNN, JR., CPA,
SETH A. LEYTON,
LEWIS P. MALOUF,
EXTREME CAPITAL, LTD.,
FIDELITY ASSET SERVICES, CORP.,
GEISCO FNF, LLC,
GOLDEN SUMMIT INVESTORS GROUP, LTD.,
SOUTHCOM MANAGEMENT, LLC, and
STONEROCK CAPITAL GROUP, LLC,

    Defendants, and

DANIEL SCOTT CODDINGTON,
CODDINGTON FAMILY TRUST,
JOANNA I. COLUMBIA ALSO KNOWN AS JOANNA I. ORNOWSKA,
VINCENT G. FARRIS, and
VINCENT G. FARRIS CO., L.P.A.,

    Relief Defendants.

---

### RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Magistrate Judge Kathleen M. Tafoya**

This case comes before the court on Defendants Merlyn Curt Geisler ("Geisler"), Marshall D. Gunn ("Gunn"), Fidelity Asset Services Corp. ("FASC"), GeiscoFNF, LLC ("Geisco"), and SouthCom Management, LLC's ("SouthCom") "Motion to Dismiss Complaint" (Doc. No. 54 [Mot.], filed March 18, 2014). Plaintiff filed its response on May 16, 2015 (Doc. No. 89 [Resp.]), and the defendants filed their reply on June 6, 2014 (Doc. No. 94 [Reply]). This motion is ripe for recommendation and order.

## STATEMENT OF CASE

This is an enforcement action filed by Plaintiff Securities Exchange Commission ("SEC") that alleges the defendants engaged in a scheme to defraud investors by inducing them to invest money or Collateralized Mortgage Obligations ("CMOs") in a CMO Trading Program that did not exist. (Compl., ¶¶ 1-4, 33-36.) The SEC asserts four claims against Defendants Geisler, Gunn, Fidelity Assert Services Corp., GeiscoFNF, LLC, and SouthCom Management, LLC. In the First Claim for Relief, the SEC asserts that the defendants violated Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c), by offering and selling unregistered securities. (*See id.*, ¶¶ 201-205.) In the Second Claim for Relief, the SEC alleges the defendants committed fraud in violation of the Section 17(a) of the Securities Act. (*See id.*, ¶¶ 206-210.) In the Third Claim for Relief, the SEC alleges the defendants committed fraud in violation of the Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5]. (*See id.*, ¶¶ 211-215.) In the Fourth Claim for Relief, the SEC alleges the defendants violated Section 15(a) of the Exchange Act [15 U.S.C. § 79o(a)] by acting as unregistered broker-dealers. (*See id.*, ¶¶ 216-219.) The following facts are taken from the Complaint.

<u>Malouf Transactions</u>

In January 2010, Daniel Coddington recruited Lewis Malouf ("Malouf"), Geisler, Gunn, and SouthCom to solicit investors. (Compl. ¶ 5, 40.) Malouf explained the CMO Trading Program to Geisler and Gunn, and sent emails and financial projection charts. Malouf claimed that he or a funding source was able to hypothecate CMOs and obtain loans of tens of millions of dollars, promising to pay investors part of the loan proceeds and to invest the remainder to generate profits ranging from 250% to 475%. The SEC alleges the purported trading program was a sham. (*Id.*, ¶¶ 38-39, 40-44, 48, 51-53.) Plaintiff alleges Coddington, Malouf and Golden Summit used the scheme to misappropriate investors' CMOs. (*Id.*, ¶¶ 1-4, 51-52, 85, 93, 114-121.)

The SEC alleges Geisler, Gunn, and SouthCom participated in a scheme by offering investments in the CMO Trading Program that did not exist. (*Id.*, ¶¶ 3, 4, 44.) The SEC alleges Geisler, Gunn, and SouthCom conducted no due diligence or investigation to determine whether Malouf's representations about the structure and profitability of the CMO Trading Program were true or to determine the identity of the purported funding source, to verify its financial ability to make loans of tens of millions of dollars, or to determine whether it had any experience or success trading securities and generating returns of up to 475% per year. (*Id.*, ¶ 46.) The SEC asserts the defendants knew, or were reckless in not knowing, that their statements to investors about the CMO Trading Program were false and misleading. (*Id.*)

The SEC alleges in January and February 2010, Geisler, Gunn, and SouthCom made false and misleading statements in telephone conversations and emails to three

3

investors that Malouf or his funding source would hypothecate investors' CMOs to obtain loans, pay pre-trade distributions to investors of $500,000 to $1,000,000, and invest the loan proceeds to generate profits up to 475%. (*Id.*, ¶¶ 5, 34, 35, 44, 45, 47.) By means of their false and misleading statements, Geisler, Gunn, and Southcom convinced three investors to invest CMOs valued at $4.6 billion into the CMO Trading Program. (*Id.*, ¶ 47.) The CMOs were transferred to Golden Summit's account by February 12, 2010. (*Id.*)

Shortly after the CMOs were delivered to Golden Summit's account, Malouf failed to hypothecate the CMOs or pay the investors pre-trade distributions. (*Id.*, ¶ 48.) To prevent investors from demanding return of the CMOs, Malouf made false excuses for the delays. (*Id.*, ¶ 49.) Geisler and Gunn repeated these lulling statements without determining if there was any basis in fact for the delays. (*Id.*, ¶¶ 49-50.) The SEC alleges Coddington obtained approximately $131,122 in interest payments paid on the three investors' CMOs that had been deposited into Golden Summit's brokerage account. (*Id.*, ¶ 51.) Coddington later returned the CMOs, but not the misappropriated interest, to the investors. (*Id*, ¶ 53.)

Coddington Transactions

The SEC alleges in the summer of 2010, Coddington directly recruited Geisler, Gunn, and SouthCom to offer and sell investments in the CMO Trading Program. (*Id.*, ¶¶ 69-71.) Geisler and Gunn, on behalf of SouthCom, signed agreements with Coddington and Golden Summit to sell investment in the CMO Trading Program, and receive transaction-based compensation. (*Id.*, ¶¶ 72, 199.) Geisler and Gunn created an

operating agreement for Geisco to pool investors' funds for investment in the CMO Trading Program, and offered documents for SouthCom, Geisco, and FASC based on documents sent by Coddington. (*Id.*, ¶¶ 75, 78-82.) The SEC asserts Geisler and Gunn entered into the agreements despite knowing, and without disclosing to investors, that Coddington and Golden Summit had previously failed to perform in the CMO Trading Program offered by Malouf, and without doing any due diligence to determine whether Golden Summit and Coddington could perform as promised. (*Id.*, ¶¶ 73, 77, 83, 84.)

The SEC alleges between September and November 2010, Geisler, Gunn, SouthCom, FASC, and Geisco made false and misleading statements of material fact in the offering documents they prepared and sent to, and used in their conversations and emails with, investors, that:

> a. Golden Summit and Coddington would obtain loans of 5% of current value of the CMOs by hypothecating the CMOs obtained from investors or purchased using investor funds, which were to remain in Golden Summit's brokerage account;
> b. Golden Summit and Coddington would pay part of the loan proceeds as a pre-trade distribution to investors within fifteen days of delivery of the CMOs;
> c. Golden Summit and Coddington would invest the balance of the loan proceeds in an equities trading platform that would generate profits of at least 1.25% per trading tranche with 200 tranches to be completed within a year (for a total return of approximately 250%); and
> d. Golden Summit and Coddington would return the CMOs to investors at the conclusion of the investment.

(*Id.*, ¶¶ 75, 78-83.) The SEC alleges, however, that the CMO Trading Program did not exist. (*Id.*, ¶¶ 4, 83.) The SEC asserts Geisler and Gunn knew, or were reckless in not knowing, that their statements about the CMO Trading Program were false, because they conducted no due diligence or investigation to determine whether representations about

5

the structure and profitability of the CMO Trading Programs were true. (*Id.*, ¶¶ 77, 83, 84.)

The SEC alleges between September and November 2010, Geisler, Gunn, SouthCom, Geisco and FASC convinced nine investors to invest $8,657,890 and seven CMOs valued at $8.3 billion into a CMO Trading Program. (*Id.*, ¶¶ 84, 94.) The SEC alleges Geisler, Gunn, SouthCom and Geisco were to receive transaction-based compensation. (*Id.*, ¶ 199.) In November and December 2010, Coddington directed Erwin to use investors' funds to pay $500,000 to FASC for the benefit of SouthCom, Geisler and Gunn; and to pay $350,000 to Geisco Holdings International for the benefit of Geisler. (*Id.*, ¶¶ 5, 93, 177, 178.) In November 2010, after Coddington and Golden Summit failed to hypothecate the CMO or pay pre-trade distributions within fifteen days of delivery of the first CMO, Geisler and Gunn began making false "lulling" statements to investors about the delays to prevent investors from terminating their investments and demanding the return of their funds or CMOs, and from contacting regulatory authorities. (*Id.*, ¶¶ 5, 103-113.) As a result of the scheme, investors suffered total losses of their invested funds and most lost the CMOs they invested in the scheme. (*Id.*, ¶ 93.)

Defendants Geisler, Gunn, Fidelity Assert Services Corp., GeiscoFNF, LLC, and SouthCom Management, LLC seek dismissal only of the Second and Third Claims asserted against them on the bases that the Complaint fails to state a claim in connection with the alleged false statements and omission, alleged fraudulent conduct, and fails to adequately plead scienter or negligence. (*See* Mot.)

**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted).

"A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall v. Bellmon*, 935 F.2d 1106, 1198 (10th Cir. 1991). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pleaded facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The *Iqbal* evaluation requires two prongs of analysis. First, the court identifies "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusion, bare assertions, or merely conclusory. *Id.* at 679-81. Second, the Court considers the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 679.

Notwithstanding, the court need not accept conclusory allegations without supporting factual averments. *Southern Disposal, Inc., v. Texas Waste*, 161 F.3d 1259, 1262 (10th Cir. 1998). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S at 678. Moreover, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does the complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Id.* (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.* (citation omitted).

"In a securities case, [the Court] may consider, in addition to the complaint, documents incorporated by reference into the complaint, public documents filed with the SEC, and documents the plaintiffs relied upon in bringing suit." *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1196 (10th Cir.2013); *see also Prager v. LaFaver*, 180 F.3d 1185, 1189 (10th Cir. 1999) (on review from grant of 12(b)(6) motion, court may consider documents referred to in complaint that are "central to [the plaintiff's] claim").

## ANALYSIS

To state a cause of action under Section 10(b) of the Exchange Act, the SEC must prove by a preponderance of the evidence that a particular defendant made "(1) a misrepresentation or omission (2) of material fact, (3) with scienter, (4) in connection

with the purchase or sale of securities, and (5) by virtue of the requisite jurisdictional means."[1] *SEC v. Wolfson*, 539 F.3d 1249, 1256 (10th Cir. 2008) (citation omitted).

Section 17(a)(1)-(3) requires substantially similar proof with respect to the offer or sale of securities. *Id.* The primary difference between Section 17(a) and Section 10(b) lies in the element of scienter. Section 10(b) and Section 17(a)(1) require the SEC to establish scienter, whereas negligence is sufficient for Sections 17(a)(2) and (3). *Id.* at 1256-57 (citing *Aaron v. SEC*, 446 U.S. 680, 697 (1980)); *SEC v. Pros Int'l., Inc.*, 994 F.2d 767, 769 (10th Cir. 1993)). Defendants argue that the SEC has failed to adequately plead untrue statements of material facts or omission.[2] (*See* Mot. at 14-17.) Defendants also argue that the SEC does not allege the defendants engaged in fraudulent conduct. (*See id.* at 17-19.) Finally, Defendants argue the SEC's Section 17(a)(2) fails because plaintiff fails to plead sufficient facts "to obtain." (*See id.* at 21-23.) The court addresses each argument in turn.

---

[1] The jurisdictional means requirement is satisfied by the use of the means and instrumentalities of interstate commerce, including the mails, telephone, or internet in connection with the fraud. 15 U.S.C. §§ 77q(a) & 78j(b); 17 C.F.R. § 240.10b–5. *See also SEC v. Solucorp Industries, Ltd.*, 274 F. Supp. 2d 379, 419 (S.D.N.Y.2003).

[2] In their motion, Defendants cite to twenty exhibits and rely heavily on the exhibits in arguing the claims should be dismissed. However, the SEC did not incorporate by reference or attach any of these documents to its Complaint. Because consideration of these exhibits would require the court to convert Defendants' motion to dismiss to a motion for summary judgment, the court rejects and will not consider the documents attached to Defendants' Rule 12(b)(6) Motion to Dismiss. *See P Morgan Trust Co. Nat. Ass'n v. Mid-America Pipeline Co.*, 413 F. Supp. 2d 1244, 1256–57 (D.Kan.2006) (a court "has discretion in deciding whether to convert a motion to dismiss into a motion for summary judgment by accepting or rejecting the attached documents.").

1.  *Section 10(b) Claims*

"Liability under § 10(b) [is] limited in its reach to 'only the making of a material misstatement (or omission) or the commission of a manipulative act.' " *Wolfson*, 539 F.3d at 177-78 (quoting *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177-178 (1994). Under Rule 10b–5(b), "the maker of the statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011). Defendants contend the SEC has failed to allege that these defendants are "makers" of the material false statements as required by *Janus Capital Group*. (Mot. at 14.)

However, in its Complaint, the SEC alleges that in January and February 2010, "Geisler, Gunn, and SouthCom made false and misleading statements about the CMO Trading Program" in conversations with, and emails sent to investors that "Malouf or the funding source would hypothecate investors' CMOs to obtain loans;" "pay pre-trade distributions of between $500,000 and $1,000,000 to each investor;" and "invest the loan proceeds in a trading platform to generate profits up to 475%." (Compl., ¶¶ 44, 45.) In addition, the SEC alleged that "[i]n September 2010, Geisler and Gunn on behalf of SouthCom, Geisco and FASC created offering documents including a cover letter, program guidelines, and various agreements that they sent by email to investors who wanted to invest in the CMO Trading Program (jointly referred to as 'the Offering Documents')." (*Id.*, ¶ 79.) The SEC also alleges the defendants "repeated in the Offering Documents and their conversations and emails with investors the false and misleading

10

statements set forth in [the Complaint at] paragraph 75." (*Id.*, ¶ 80.) Geisler and Gunn as the managing directors of SouthCom, Geisco, and FASC signed the Offering Documents, agreements and exhibits sent to investors. (*Id.*, ¶¶ 81-83.) Persons who sign documents are makers of the statements within them. *SEC v. Brown*, 878 F. Supp. 2d 109, 116 (D.D.C. 2012) ("[B]y signing a corporate document, the signer is stating to the world that he, with other signers, is jointly making the statements within the document.")

Defendants also argue that none of the asserted "lulling" statements are pleaded to be material false statements and none are in connection with the purchase or sale of a security. (Mot. at 14.) "Fed. R. Civ. P. 9(b) requires that to state a claim for securities fraud, '[t]he plaintiff must set forth what is false or misleading about a statement, and why it is false'. In other words, the plaintiff must set forth an explanation as to why the statement or omission complained of was false or misleading." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1124 (10th Cir. 1997) (quoting *In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir.1994) and citing 15 U.S.C. § 78u–4(b)). A fact is material if there is a substantial likelihood that a reasonable investor would consider the information important in making an investment decision. *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).

In its Complaint, the SEC alleges that the defendants knew none of them "had the ability to successfully hypothecate the investors' CMOs with third party institutions or alternatively to act as a funding source for the program, invest the loan proceeds, and generate trading profits of approximately 250%." (Compl., ¶ 83.) The court finds the SEC sufficiently alleges what is false or misleading about the statements. *Novell*, 120 F.3d at 1119. The SEC argues that these lulling statements were material because a

reasonable investor would consider the information in deciding whether to terminate and sell their investment in the CMO Trading Program. (Resp. at 8.) The court also agrees with the SEC that a reasonable investor would have considered defendants' statements important in deciding whether to terminate or sell their investment.

Defendants also argue that Malouf was the maker of the false statements because he prepared an "offer" attached to their motion as Exhibit 1, and that Malouf relied on Geisler and Gunn to pass on his statements to their clients. (Mot. at 15.) The court has already determined it will not consider the exhibits attached to the motion to dismiss. Nevertheless, to the extent Defendants claim Geisler and Gunn did not create or control the false source of information they provided to the three investors about Malouf's CMO Trading Program, the SEC has alleged that Malouf did not communicate with the investors directly, but instead relied on Geisler, Gunn and SouthCom to make the statements. (*See* Compl., ¶¶ 44, 45.) As the makers who communicated the false and misleading information to the investors, Geisler, Gunn, and SouthCom controlled the contents of their statements, and were obligated to determine that their representations were true before they made the statements to investors. *See Janus*, 131 S. Ct. at 2302 ("Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it.")

Defendants also assert Coddington or Erwin were the makers of any statements in the second scheme because they created the document templates and controlled the agreement terms. (Mot. at 16.) However, although Geisler and Gunn used templates (*see* Compl., ¶ 79), the SEC alleges they created and signed Offering Documents that

contained the false statements and had ultimate control over the contents. (*Id.*, ¶ 75, 79-83.) *See Janus*, 131 S. Ct. at 2302.

Defendants also claim the falsity of Coddington's statements was hidden from them. (Mot. at 17.) However, the SEC alleges that Geisler and Gunn were reckless because they did no due diligence to determine if Coddington and Golden Summit could do what they represented, and were aware of the failure of the CMO Trading Program with respect to the investors that they solicited on behalf of Malouf. (Compl., ¶¶ 46, 77, 83.) Recklessness meets the requirements for the element of scienter. *City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245, 1258 (10th Cir.2001) (quoting *Anixtor v. Home-Stake Production Co.*, 77 F.3d 1215, 1232 (10th Cir. 1996). The SEC has pleaded facts from which the court may infer Defendants knew their statements were false and misleading, or that they acted recklessly in making them without any investigation of the truth.

Finally, citing *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 486 (S.D.N.Y. 2007), Defendants claim their role in the creation of the fraudulent statements is purely ministerial. (Mot. at 17.) The SEC argues that the defendants' role was not ministerial because they created offering documents and operating agreements in concert with Coddington to make the business venture appear legitimate, and they made false statements to induce investors to participate in the CMO Trading Programs. (Resp. at 10.) The SEC also argues Geisler and Gunn solicited the lion's share of the investments of cash and CMOs. (*Id.*) The court in Collins stated, "By contrast [to an administrative role], a person who, in concert with others, participates in a securities fraud scheme by

13

making false statements does incur liability under Section 10(b)." *Collins*, 524 F. Supp. at 486. The court agrees that the SEC has alleged that the defendants did not play minor roles in the alleged schemes.

## 2.  *Scheme to Defraud Claims*

Defendants argue that the SEC has failed to allege deceptive conduct beyond the making of fraudulent statements or omissions, and, thus, the SEC has failed to state claims the defendants violated the "scheme to defraud" provisions of Section 17(a)(1) and (3) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5(b) . (Mot. at 17.) Defendants assert that the Complaint fails to attribute any conduct beyond the making of fraudulent statements or omissions to them. (*Id.* at 18.) Defendants also assert that there is no allegation that they did anything other than repeat statements given to them by Coddington, Erwin, and Malouf. (*Id.* at 19.)

Within the Complaint, however, the SEC alleges the defendants did several acts that created a false appearance of fact in furtherance of the scheme, including making false statements. The SEC alleges Geisler and Gunn created an operating agreement for Geisco to pool investors' money to invest in Golden Summit's CMO Trading Program. (Compl., ¶ 78.) The SEC alleges Geisler and Gunn created Offering Documents for SouthCom, Geisco and FASC. (*Id.*, ¶ 79.) The SEC alleges they made false statements about the structure and performance of the CMO Trading Program without doing any due diligence or investigation to determine if their statements were true. (*Id.*, ¶¶ 46, 77, 83.) The SEC alleges the defendants directed investors to transfer their CMOs to the brokerage account of Golden Summit, without restricting Golden

14

Summit's ability to sell or transfer those securities out of the account. (*Id.*, ¶¶ 47, 94, 100, 102.) The SEC also alleges that, to stop investors from terminating their investments and withdrawing their securities or funds from the trading program, the defendants made lulling statements. (*Id.*, ¶¶ 50, 77, 105, 110, 186, 187.) As a result, Geisler, Gunn, SouthCom, Geisco and FASC received at least $855,000. (*Id.*, ¶¶ 177-78.)

The court finds these allegations, at the pleading stage, are sufficient to state a claim that the defendants engaged in a scheme to defraud investors in violation of Section 17(a)(1) and (3) of the Securities Act, and Rule 10b-5(b) and Section 10(b) of the Exchange Act.

3.    *Scienter and Negligence for Section 17(a)(2), (2), and (3) and Section 10(b) Claims*

Defendants argue that the Complaint does not satisfy the elements scienter for the Section 10(b) and § 17(a)(1) claims or the element of negligence for the Section 17(a)(2) and (3) claims.

Though Federal Rule of Civil Procedure 9(b) requires averments of fraud to be pleaded with "particularity," the rule does not require particularized pleadings as to issues such as the intent, knowledge, or state of mind of the person making the statement. *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997). Rather, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Moreover, although the rule requires the plaintiff to identify the person or persons allegedly responsible for making the misstatement, it does not require the plaintiff to particularize the reasons why the plaintiff believes the alleged speaker to be responsible for the statement. *Id.* at 1253 ("Rule 9(b) does not require that a

complaint set forth detailed evidentiary matter as to why particular defendants are responsible for particular statements, or that the allegations be factually or legally valid").

The SEC alleges the defendants knew, or were reckless in not knowing, that their statements to investors about the CMO Trading Program and Malouf's lulling statements were false and misleading and that the defendants knew, or were reckless in not knowing, that Coddington and Golden could not meet the terms of the proposed investment. (Compl. ¶¶ 46, 50, 77, 104-5, 110.)  The SEC also alleges that "Geisler, Gunn, and SouthCom conducted no due diligence or investigation . . ." (*id.*, ¶ 46), and that Geisler and Gunn did no due diligence to determine if Coddington and Golden Summit could meet the terms of the CMO Trading Program, even though they were aware of the failure of the CMO Trading Program with respect to the investors they solicited through Malouf (*id.*, ¶ 77).  The SEC's allegations are sufficient to support an inference that the defendants' failure to reveal the facts known, or facts that should have been known to them, likely would mislead investors and are sufficient to support the SEC's allegations of the defendant's scienter.

Defendants also assert the Complaint lacks allegations of negligence to support the SEC's claim that the Defendants violated Section 17(a)(2) and (3) of the Securities Act.  (Mot. at 21.)  However, because the Complaint adequately pleads scienter against the defendant under the more rigorous scienter standards, Defendants' argument that the SEC fails to plead the lesser negligence requirement is without merit. *See SEC v. Nacchio*, 438 F. Supp. 2d 1266, 1283 (D. Colo. 2006) (denying motion to dismiss negligence claims where the plaintiff's complaint met the scienter element).

### 4.   *Section 17(a)(2) and Obtaining Money and Property by Means of False Statements*

Finally, Defendants argue that the SEC fails to allege sufficient facts to establish the defendants obtained money or property by means of untrue statements of material fact. (Mot. at 21.)

The defendants argue that the only allegations in the Complaint touching on the defendants' receiving any money or property are those of Geisler receiving misappropriated funds in the amount $459,600 wired from the Erwin trust account and Gunn receiving misappropriated funds in the amount of $400,000 also wired from the Erwin trust account at Coddington's direction.[3] (Mot. at 21-22 [citing Compl., ¶¶ 93, 177, 178].) The SEC alleges that the defendants obtained $8,657,890 in cash and CMOs valued at $14.9 billion from investors through their allegedly untrue statements of material fact. (*See* Compl., ¶¶ 47, 84, 172, 193-196.) The SEC also alleges, "Ultimately, the[ ] investors' funds were either misappropriated by the proposed Defendants or transferred to the proposed relief defendants." (*Id.*, ¶ 172.) Under Section 17(a)(2), the SEC must prove that the defendants <u>directly or indirectly</u> obtained money or property by means of an untrue statement of material fact or an omission to state a material fact. 15 U.S.C. § 77q(a)(2).

The court finds the allegations are sufficient, at the pleading stage, to show that the defendants obtained money or property by means or untrue statements of material fact.

---

[3] Defendants attempt to argue by way of an exhibit attached to their motion that the funds were unrelated to the transactions alleged in the Complaint. (*See* Mot. at 22.) However, this court has determined it will not consider the defendants' exhibits.

**WHEREFORE**, for the foregoing reasons, this court respectfully

**RECOMMENDS** that the "Motion to Dismiss Complaint" (Doc. No. 54) be **DENIED**.

### ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995).  A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review.  "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review."  *United States v. One Parcel of Real Prop. Known As 2121 East 30th Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge.  *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (a district court's decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *One Parcel of Real Prop.*, 73 F.3d at 1059-60 (a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review

by the district court or for appellate review); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the magistrate judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the magistrate judge's ruling); *but see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

Dated this 4th day of March, 2015.

BY THE COURT:

_____
Kathleen M. Tafoya
United States Magistrate Judge