**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 13-cv-03363-CMA-KMT

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

v.

JESSE W. ERWIN, JR., and
LEWIS P. MALOUF,

      Defendants, and

DANIEL SCOTT CODDINGTON,

      Relief Defendant.

---

**ORDER GRANTING IN PART AND DENYING IN PART BOTH PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AGAINST RELIEF DEFENDANT DANIEL SCOTT
CODDINGTON AND RELIEF DEFENDANT CODDINGTON'S MOTION FOR
SUMMARY JUDGMENT**

---

This matter is before the Court on Plaintiff's Motion for Summary Judgment

Against D. Scott Coddington (Doc. # 251) and Relief Defendant Scott Coddington's

Motion for Summary Judgment (Doc. # 253). In its Motion, the Securities and Exchange

Commission (the "Commission") moves for summary judgment against Relief Defendant

Daniel Scott Coddington ("Scott Coddington" or "Mr. Coddington") on its claim that he

was unjustly enriched when he received ill-gotten funds obtained from securities fraud

committed by his father Daniel Dirk Coddington ("Daniel Coddington"), Golden Summit

Investors Group Ltd. ("Golden Summit"), Extreme Capital Ltd. ("Extreme Capital"), and

Jesse W. Erwin, Jr. (collectively, "Defendants"). In his Motion, Scott Coddington asserts that he is an improperly named relief defendant on the grounds that he has a legitimate claim to the funds he received and he no longer possesses the funds. For the following reasons, both Motions are granted in part and denied in part.

## I.   BACKGROUND[1]

### A.   SECURITIES FRAUD BACKGROUND

In December 2013, the Commission filed this civil action against thirteen defendants and five relief defendants based on their respective roles in fraudulently inducing more than 30 investors to transfer approximately $18 million in cash and approximately $11.4 million in collateralized mortgage obligations ("CMOs") to entities controlled by Mr. Erwin and Daniel Coddington, who is now deceased.

From at least July 2010 through at least July 2011, Defendants offered and sold securities in the form of investment contracts with Golden Summit and Extreme Capital to participate in a "CMO Trading Program." Only 60- to 70% of the money Daniel Coddington and Mr. Erwin received from investors was used to purchase CMOs. They diverted, on average, approximately 30% of the investors' funds for their own personal use and for purposes other than for purchasing CMOs. *See* (Doc. # 241 at 8–27).[2]

---

[1] Unless otherwise noted, the following facts are undisputed.

[2] In October 2015, Daniel Coddington and Mr. Erwin were indicted on two counts of securities fraud and thirteen counts of wire fraud stemming from the conduct alleged in this action. *See United States v. Daniel Dirk Coddington and Jesse W. Erwin, Jr.*, No. 15-cr-00383-RBJ (D. Colo., filed Oct. 5, 2015). Ultimately, Mr. Erwin pled guilty to one count of securities fraud and one count of wire fraud and was sentenced to 58 months of imprisonment. Daniel Coddington was convicted at trial on all counts, but his conviction was later reversed on the basis that he died while his appeal was pending.

Based on Defendants' misrepresentations, three investors wire transferred $1,324,983 to Golden Summit's bank account and at least twelve investors wire transferred $7,332,908 to Mr. Erwin's escrow account in October and November of 2010. (Doc. # 251 at 7.) Of the $7.3 million that came into Mr. Erwin's escrow account during November 2010, only $4.2 million was sent to Golden Summit's brokerage account. Nearly all of the investors' funds left in Mr. Erwin's escrow account were transferred to Extreme Capital and Coddington Family Trust without any consideration.

Between November and December of 2010, Daniel Coddington directed Mr. Erwin to transfer a total of $1,805,966.75 of investors' funds from Mr. Erwin's escrow account in New York to Extreme Capital's Wells Fargo bank account in Colorado. (*Id.* at 9.) Additionally, between November 2010 and April 2011, Daniel Coddington and Mr. Erwin transferred a total of $815,000 in investors' funds to Coddington Family Trust's Wells Fargo bank account, contrary to the agreements with investors to use their funds to purchase CMOs only. Some of the investors' funds were then sent to third parties and paid to Scott Coddington, as discussed in detail below.

Defendants did not purchase any CMOs, hypothecate CMOs to obtain lines of credit, or engage in securities trading transactions to fulfill the terms of Golden Summit's investment contracts. (*Id.*) Despite Daniel Coddington's promise to return investors' money, only one investor received his money back. The other investors did not receive any of their money back. All but one investor lost their entire investment. (*Id.* at 8.)

**B.    SCOTT CODDINGTON**

During the relevant period, Scott Coddington was an officer and director of Golden Summit and Extreme Capital; he was not an employee of either entity. (*Id.* at 9.) During parts of 2010, 2011, and 2012, Scott Coddington worked for his father as his personal assistant. (Doc. # 253 at 2.) Mr. Coddington did whatever his father asked him to do, including the following tasks: writing checks for his father's companies, Extreme Capital and Golden Summit; filling out brokerage account agreements, scanning documents, getting office supplies, collecting mail from the companies' P.O. box, executing bank transactions, being a signatory on Extreme Capital and Golden Summit's bank accounts, pulling documents off the Internet and filling them out, drafting correspondence, moving and unpacking his father's belongings, meeting with cleaning staff, picking up items from the store, and making sure his father ate meals. (*Id.* at 3–4.) Scott Coddington asserts that he worked around 30 to 40 hours per week for his father, which the Commission disputes.

During parts of 2010, 2011, and 2012, Scott Coddington was paid $6,000 per month (or $5,000 per month for part of 2010) through Extreme Capital and Golden Summit. (*Id.* at 4.) He was paid once per month, typically at the beginning of the month through cash withdrawals from the bank. Mr. Coddington received **at least** $108,000 in cash withdrawals from Extreme Capital's bank account between September 2010 and May 2012. *Compare* (Doc. # 253 at 5) (Coddington's calculation that he withdrew $119,000) *with* (Doc. # 265 at 7) (the Commission's calculation that he withdrew $108,000). Mr. Coddington asserts that the monthly withdrawals constituted salary

4

payments for work he performed as Daniel Coddington's personal assistant. The Commission asserts that Scott Coddington did not provide services to either Extreme Capital or Golden Summit and, therefore, he was unjustly enriched by these payments.

Between November 2010 and April 2012, Scott Coddington withdrew $120,509.10 in cash from the Coddington Trust bank account in ten transactions. (Doc. # 251 at 12.) Mr. Coddington asserts, and the Commission does not dispute, that he made these cash withdrawals on his father's behalf, that he transferred the money to his father shortly after withdrawing it, and that he did not benefit from the withdrawals. *See* (Doc. # 266 at 9); (Doc. # 265 at 12).

Mr. Coddington also received gifts from his father. In June 2011, Daniel Coddington gave him a $15,000 cash gift. (Doc. # 253 at 6.) In December 2010 and January 2012, Daniel Coddington gave Scott Coddington a total of $30,000 in cash Christmas gifts, drawn from Coddington Family Trust's bank account. (*Id.* at 7.) On two occasions, funds from Extreme Capital and Coddington Family Trust were used to pay school tuition for Scott Coddington's children. First, in May 2011, Daniel Coddington paid $10,835 in tuition, drawn from Extreme Capital's bank account, to the school Mr. Coddington's children attended. (*Id.* at 6.) Second, on April 11, 2012, Scott Coddington wrote a tuition check for $10,903.57, drawn on Coddington Family Trust's bank account. (Doc. # 251 at 12.)

Scott Coddington also received $28,000 from Extreme Capital as a car loan from his father to buy a 2008 Honda Odyssey mini-van. (Doc. # 253 at 6.) Mr. Coddington asserts that he paid his father back in full, which the Commission disputes.

Scott Coddington no longer possesses any of the money he received from the securities fraud, as it was spent years ago on various living expenses. (*Id.* at 9.)

## II.    LEGAL STANDARDS

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okl.*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *See id.* However, conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id.* In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out to the Court a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met its initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Id.* Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. Stated differently, the party must provide "significantly probative evidence" that would support a verdict in his favor. *Jaramillo v. Adams Cty. Sch. Dist. 14*, 680 F.3d 1267, 1269 (10th Cir. 2012). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

### III.    DISCUSSION

In the instant action, the Commission has not accused Scott Coddington of any wrongdoing. Instead, the Commission has named him as a relief defendant, alleging that he was unjustly enriched by ill-gotten gains from the securities fraud committed by Defendants.

The Commission moves for summary judgment on its claim that Scott Coddington was unjustly enriched by $317,247.67[3] in ill-gotten gains derived from the underlying securities fraud and moves the Court to order disgorgement of that amount. Mr. Coddington moves for summary judgment on the grounds that he has a legitimate claim to all of the funds the Commission seeks to disgorge and he is no longer in possession of the funds. For the following reasons, the Commission's Motion is granted

---

[3] This total was amended to include the $28,000 car loan that Mr. Coddington admitted to having received in his Motion for Summary Judgment.

as to the gifts and tuition payments, and it is denied as to the $28,000 car loan and the $108,000 in purported salary payments. Mr. Coddington's Motion is granted with respect to the $120,509.10 in cash withdrawals from the Coddington Family Trust bank account and is denied in all other respects.

## A.    APPLICABLE LAW

The Commission is authorized by both the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act") to bring civil enforcement actions seeking equitable relief in the form of injunctions against those committing violations of the Acts. *See* 15 U.S.C. §§ 77t(b), 78u(d)(1). In such actions, federal courts may grant "any equitable relief that may be appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5).

Disgorgement is well-recognized as a form of "equitable relief" that prevents defendants from "circumventing" courts' ability to "recapture fraud proceeds by the simple procedure of giving those proceeds to friends and relatives." *SEC v. United Am. Ventures, LLC*, No. 10-cv-568, 2012 U.S. Dist. LEXIS 51978, at *29–*30 (D.N.M. Mar. 2, 2012) (internal quotation omitted); *see also SEC v. Shields*, 744 F.3d 633, 637 n.2, 639 (10th Cir. 2014). As relevant to the instant Motions, courts "have broad equitable powers to order disgorgement from third parties who have received the proceeds of another's violation of securities laws if the party in possession of the proceeds has no legitimate claim to it." *SEC v. End of the Rainbow Partners, LLC*, No. 1:17-cv-02670-MSK, 2020 U.S. Dist. LEXIS 21198, at *11 (D. Colo. Feb. 7, 2020) (citing *S.E.C. v. World Capital Market, Inc.*, 864 F.3d 996, 1003–04 (9th Cir. 2017)). In such

8

circumstances, non-violating third parties are referred to as "relief defendants" or "nominal defendants."

To establish a claim for disgorgement against a relief defendant, the Commission must show that the relief defendant: 1) received ill-gotten funds; and 2) does not have a legitimate claim to those funds. *S.E.C. v. Cherif*, 933 F.2d 403, 414 (7th Cir. 1991) (citations omitted). Because of the non-interested status of the relief defendant, there is no claim against him and it is unnecessary to obtain subject matter jurisdiction over him once jurisdiction over the defendant is established. *Id.* at 414; *Farmers' Bank v . Hayes,* 58 F.2d 34, 36 (6th Cir. 1932).

**B.    ANALYSIS**

1.    <u>Whether Scott Coddington Received Ill-Gotten Funds</u>

The Commission has demonstrated that there is no genuine dispute of material fact with respect to whether Defendants committed securities fraud in violation of the Securities Act and the Exchange Act, as well as whether Scott Coddington received ill-gotten funds from that securities fraud. Although Mr. Coddington nominally disputes that any violations of securities laws occurred (Doc. # 253 at 2), he has conceded all material facts that establish the underlying securities fraud (Doc. # 266 at 2).

*a.    Defendants committed securities fraud*

To prove a violation of Section 17(a) of the Securities Act, the Commission must show that a defendant, directly or indirectly, in the offer or sale of securities, by use of interstate commerce or the mails did one or more of the following: (a) employed a device, scheme, or artifice to defraud investors; (b) obtained money or property by

means of an untrue statement of material fact or by omitting to state a material fact that made what was said, under the circumstances, misleading; or (c) engaged in a transaction, practice, or course of business that operated, or would operate, as a fraud or deceit upon the purchaser of securities. 15 U.S.C. § 77q(a). The Commission must also show that a defendant acted with scienter for violation of Section 17(a)(1) or negligently for Sections 17(a)(2) and (3). *See* A*aron v. SEC*, 446 U.S. 680, 695–702 (1980); *In re Level 3 Communications, Inc. Sec. Lit.*, 667 F.3d 1331, 1343 n.12 (10th Cir. 2012).

Similarly, to prove a violation of Section 10(b) of the Exchange Act or Rule 10b-5 thereunder, the Commission must show that a defendant, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce or of the mails, did one or more of the following: (a) employed a device, scheme or artifice to defraud; (b) made an untrue statement of material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon purchasers of securities; with scienter. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; s*ee SEC v. Wolfson*, 539 F.3d 1249, 1256 (10th Cir. 2008).

In the instant case, the Commission has demonstrated that Defendants offered and sold securities in the form of investments in Golden Summit's CMO Trading Program. *See* 15 U.S.C. §§ 77b(a)(1), 78c(a)(10) (defining the term "security" to include

any "stock," "bond," "or "investment contract."). It has further demonstrated that Defendants used interstate commerce or the mails to defraud investors; specifically, Defendants discussed the CMO Trading Program in telephone calls, sent the investment agreements by email, and directed investors to wire transfer funds to the bank accounts of Golden Summit and Mr. Erwin through interstate commerce.

Moreover, the Commission has established that Defendants offered and sold investments in Golden Summit or Extreme Capital, with scienter, by means of misrepresentations of material fact. Defendants knowingly made the following misrepresentations, among others, to investors: Coddington had the experience and connections necessary to successfully hypothecate the CMOs; all investors' funds would be used to acquire CMOs, which would be used as collateral to obtain loans from European banks with the CMOs remaining in Golden Summit's brokerage account; part of the loan proceeds were to be paid to the investors as a pre-trade distribution with the balance of the proceeds invested in a trading program that bought and sold securities; the profits were to be paid to investors; and Defendants were to receive no compensation until after hypothecation of the CMOs and trading profits were received by investors. By means of these material misrepresentations of fact, Defendants offered and sold securities and obtained at least $8,657,890 of investors' funds.

Accordingly, the Commission has established that Defendants committed securities fraud in violation of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder.

### b.   Scott Coddington received proceeds from that fraud

It is undisputed that Daniel Coddington, Golden Summit, and Mr. Erwin transferred $1,805,966.75 of the investors' funds to Extreme Capital and $815,000 in cash to Coddington Family Trust. Neither Extreme Capital nor Coddington Family Trust provided any consideration for the funds.

In turn, funds from Extreme Capital and Coddington Family Trust were diverted to Scott Coddington. Between December 2010 and May 2012, Scott Coddington withdrew a total of at least $108,000 in cash from Extreme Capital's bank account. Between November 2010 and April 2012, Scott Coddington withdrew a total of $120,509.10 from Coddington Trust's bank account. Mr. Coddington also received $45,000 in cash gifts from his father, which were drawn from the bank accounts of Extreme Capital and Coddington Family Trust, between December 2010 and January 2012. In June 2011, Scott Coddington borrowed $28,000 from his father, drawn from Extreme Capital's bank account, to buy a car. Extreme Capital and Coddington Trust also made two tuition payments,[4] totaling $21,738.57, to the school Scott Coddington's children attended.

The Commission has met its burden of establishing that the aforementioned funds, provided by Extreme Capital and Coddington Family Trust for the benefit of Scott

---

[4] Mr. Coddington concedes that he withdrew $10,903 from Coddington Family Trust as tuition for his children but objects to the Commission seeking disgorgement of those funds because it did not include that tuition payment in its Amended Response to Interrogatories, which contained a list of 101 transactions between March 2010 and May 2012, and noted that Mr. Coddington was unjustly enriched by **at least** $1,563,983.80. (Doc. # 266-1.).The Court agrees with the Commission that Mr. Coddington should not be surprised by the Commission's inclusion of this second tuition payment as he signed the check drawn on Coddington Trust's account, thereby receiving the benefit of ill-gotten funds.

Coddington, were investors' funds obtained through the underlying securities fraud. Mr. Coddington has provided no evidence to dispute that conclusion. Therefore, summary judgment on this element of the Commission's claim for disgorgement is warranted.

2.    <u>Whether Scott Coddington Has a Legitimate Claim to Those Funds</u>

The crux of the cross-Motions for Summary Judgment is whether Mr. Coddington has a legitimate claim to the funds he received. A legitimate claim to ill-gotten funds may be established if the relief defendant can demonstrate that he provided some services as consideration for the identified funds. *F.T.C. v. Direct Mktg. Concepts, Inc.*, 569 F. Supp. 2d 285, 312 (D. Mass. 2008), *aff'd,* 624 F.3d 1 (1st Cir. 2010) (citing *F.T.C. v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1273 (S.D. Fla. 2007) ("Nothing on the record indicates that [relief defendant] had a legitimate claim to the funds; [relief defendant] did not provide any services to either company to warrant the payments.")).

The Commission seeks disgorgement of $323,247.67, which constitutes $108,000 in cash payments Scott Coddington claims to have received as a salary, $45,000 in cash gifts, a $28,000 car loan, a $10,835 tuition payment from Extreme Capital, a $10,903.57 tuition payment from Coddington Family Trust, and monthly cash withdrawals of $120,509.10 from Coddington Trust. The Court concludes herein that the Commission is entitled to summary judgment with respect to the cash gifts and the tuition payments, and that Mr. Coddington is entitled to summary judgment with respect to the monthly cash withdrawals of $120,509.10 from Coddington Trust. However, the

Court concludes that genuine issues of material fact preclude summary judgment as to the remainder of the funds.

### a. Cash gifts and tuition payments

In general, "the receipt of property as a gift, without the payment of consideration, does not create a 'legitimate claim' sufficient to immunize the property from disgorgement." *Commodity Futures Trading Comm'n v. Walsh*, 618 F.3d 218, 226 (2d Cir. 2010) (citing *S.E.C. v. Cavanagh*, 155 F.3d 129, 137 (2d Cir. 1998) (explaining that to hold a relief defendant has a legitimate claim to an ill-gotten gift "would allow almost any defendant to circumvent the SEC's power to recapture fraud proceeds[ ] by the simple procedure of giving [the proceeds] to friends and relatives, without even their knowledge.")). In keeping with that principle, courts have ordered relief defendants to disgorge ill-gotten funds, or items purchased with those funds, that were obtained without consideration. *See, e.g.*, *S.E.C. v. George*, 426 F.3d 786, 798 (6th Cir. 2005) (affirming disgorgement of gifted diamond ring because it was obtained with proceeds of fraud); *Cavanagh*, 155 F.3d at 136–37 (finding that relief defendants lacked a legitimate claim to proceeds from sale of shares because the Commission was likely to show they gave no consideration for the shares and, thus, received them as a gift).

The Commission has demonstrated that Scott Coddington lacks any legitimate claim to the cash gifts and school tuition payments. Mr. Coddington concedes that he received $45,000 in cash from his father as gifts. Further, Mr. Coddington has not rebutted the Commission's showing that he gave no consideration for the $21,738.57 in tuition payments drawn from the bank accounts of Extreme Capital and Coddington

Family Trust. Therefore, these payments constitute gifts as well. *See Cavanagh*, 155 F.3d at 136–37. It follows that Mr. Coddington lacks a legitimate claim to both the cash gifts and the tuition payments, which total $66,738.57, and summary judgment is warranted with respect to those funds.[5]

   b.   *Cash withdrawals of $120,509.10*

On the other hand, Mr. Coddington is entitled to summary judgment with respect to the $120,509.10 in cash that he withdrew from the Coddington Family Trust bank account between November 2010 and April 2012. In *Liu v. SEC*, the Supreme Court clarified that disgorgement under Section 21(d)(5) must be limited to a defendant's **net profits**, excluding legitimate expenses. 140 S. Ct. 1936, 1948–50 (2020). Mr. Coddington has provided evidence, and the Commission does not dispute, that he made the $120,509.10 in cash withdrawals on his father's behalf and that he transferred the money to his father shortly after withdrawing it. *See* (Doc. # 253 at 7); (Doc. # 265 at 12). Thus, there is no genuine dispute as to whether Mr. Coddington kept and/or

---

[5] In his Motion and his Response to the Commission's Motion, Mr. Coddington asserts that this Court lacks subject matter jurisdiction over the Commission's claim for disgorgement under 15 U.S.C. § 78u(d) because a properly named relief defendant "has no ownership interest in the property which is the subject of litigation" and he asserts a legitimate claim to the ill-gotten funds that he received. *See Cherif*, 933 F.2d at 414. This argument is mooted by the Court's findings that Mr. Coddington lacks a legitimate claim to the cash gifts and tuition payments as a matter of law. Further, at least two federal courts of appeals have rejected this argument, explaining that

> relief defendants cannot defeat jurisdiction simply by asserting an ownership interest in the disputed funds; rather, . . . they must assert an interest both "recognized in law" and "valid in fact." Otherwise, any third party with a custodial claim to the proceeds of securities violations committed by others would be able to defeat relief defendant jurisdiction "simply by stating a claim of ownership, however specious."

*World Cap. Mkt., Inc.*, 864 F.3d at 1005 (quoting *Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 191–92 (4th Cir. 2002) (rejecting relief defendant's ownership claim as "not factually valid")).

benefitted from the withdrawals. Pursuant to *Liu*, disgorgement of these funds would constitute unauthorized disgorgement beyond Mr. Coddington's net profits from Defendants' wrongdoing. Accordingly, Mr. Coddington is entitled to summary judgment with respect to these funds.

### c.      All remaining funds

Upon consideration of the Motions, the related briefing, and the applicable law, the Court finds that there are genuine disputes of material fact that preclude summary judgment for either party on the Commission's claim for disgorgement of the $28,000 car loan and the $108,000 in purported salary payments. These genuine disputes of material fact include, but are not limited to:

- whether Scott Coddington paid his father back in full for the $28,000 car loan;

- what value, if any, Scott Coddington's services as a personal assistant to Daniel Coddington conferred on Extreme Capital and/or Golden Summit; and

- relatedly, what ownership interest, if any, Scott Coddington has in the disputed "salary" payments.[6]

---

[6] Payment as compensation for services actually performed by a relief defendant for a principal defendant, "albeit paid out of proceeds of the principal defendant's fraud," indicates that the relief defendant "has a 'legitimate claim' to the money absent proof of culpability on his part." *CFTC v. Hanover Trading Corp.*, 34 F. Supp. 2d 203, 207 (S.D.N.Y. 1999); *see also Direct Mktg. Concepts, Inc.*, 569 F. Supp. 2d at 312 (finding questions of fact remained with respect to whether certain funds were legitimate compensation for services rendered by the relief defendants and, thus, whether the funds could be disgorged); *cf. U.S. Commodity Futures Trading Com'n v. Schiera,* No. CV05 2660 CAS, 2006 WL 4586786, at 6 (S.D.Cal. Dec. 11, 2006) ("The Relief Defendants did not provide services to or on behalf of the Corporate Defendants and do not have a legitimate claim to the funds.").

3.    Whether Immediate Possession of the Funds Is Necessary for Disgorgement

Scott Coddington argues in his Motion that disgorgement of the aforementioned funds is inappropriate because he is not in possession of the funds. According to Mr. Coddington, a relief defendant who spends his ill-gotten gains cannot be ordered to disgorge them. Contrary to Mr. Coddington's assertion, "ongoing possession of the [ill-gotten] funds is not required for disgorgement." *World Cap. Mkt., Inc.*, 864 F.3d at 1007. Accordingly, courts have ordered relief defendants to disgorge ill-gotten gains that were no longer in the relief defendant's immediate possession. *See, e.g.*, *George*, 426 F.3d at 798 (affirming order requiring relief defendant to disgorge ill-gotten gains spent on car lease and for "unspecified purposes"). As the District of Columbia Circuit Court of Appeals has noted, to conclude otherwise "would lead to absurd results" and would "perpetuate rather than correct an inequity." *S.E.C. v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000). Indeed, if this Court were to adopt Mr. Coddington's immediate-possession requirement, then "a defendant who was careful to spend all the proceeds of his fraudulent scheme, while husbanding his other assets, would be immune from an order of disgorgement." *Id.* The Court declines to encourage such inequity by sanctioning Mr. Coddington's choice to pay down his living expenses with investors' funds rather than his own assets.

Likewise, Mr. Coddington's argument that disgorgement of the tuition payments is improper because the school possesses these funds is fruitless. "A person who controls the distribution of illegally obtained funds is liable for the funds he or she dissipated as well as the funds he or she retained." *S.E.C. v. Platforms Wireless Int'l*

*Corp.*, 617 F.3d 1072, 1098 (9th Cir. 2010). The tuition payments in this case were made to a third party for the benefit of Scott Coddington. Put differently, if investors' funds were not used to pay the tuition for Mr. Coddington's children, Mr. Coddington would have needed to use his own assets to do so. As with the other funds no longer in Mr. Coddington's possession, exempting the tuition payments from a disgorgement order would lead to the absurd result of granting Mr. Coddington immunity for spending the proceeds of fraud in lieu of his own assets.

## IV.   CONCLUSION

For the foregoing reasons, it is ORDERED as follows:

- Plaintiff's Motion for Summary Judgment Against D. Scott Coddington (Doc. # 251) is GRANTED IN PART AND DENIED IN PART. It is GRANTED with respect to the $45,000 in cash gifts and $21,738.57 in tuition payments. It is DENIED as to the $120,509.10 in cash withdrawals from the Coddington Family Trust bank account, the $108,000 in disputed "salary" payments, and the $28,000 car loan. The Commission's request for prejudgment interest is DENIED WITHOUT PREJUDICE as it is better suited for post-trial resolution;

- Relief Defendant Scott Coddington's Motion for Summary Judgment (Doc. # 253) is GRANTED IN PART AND DENIED IN PART. It is GRANTED as to the $120,509.10 in cash withdrawals from the Coddington Family Trust bank account. It is DENIED in all other respects;

- summary judgment shall enter in favor of Plaintiff Securities and Exchange

Commission and against Relief Defendant D. Scott Coddington on Plaintiff's claim for disgorgement with respect to the $45,000 in cash gifts and $21,738.57 in tuition payments only;

- summary judgment shall enter in favor of Relief Defendant D. Scott Coddington on Plaintiff's claim for disgorgement with respect to the $120,509.10 in cash withdrawals from the Coddington Family Trust bank account only;

- Relief Defendant D. Scott Coddington is hereby ORDERED to pay $66,738.57 in disgorgement; and

- the parties shall inform the Court, by email sent to Arguello_Chambers@cod.uscourts.gov by August 20, 2021, of how many days they will require to try the Commission's remaining claim for disgorgement against Scott Coddington.

DATED:  August 10, 2021

BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge