**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Civil Action No. 13-cv-03363-CMA-KMT

SECURITIES AND EXCHANGE COMMISSION,

     Plaintiff,

v.

JESSE W. ERWIN, JR.,  and
LEWIS P. MALOUF,

       Defendants,

DANIEL SCOTT CODDINGTON,

     Relief Defendant.

---

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT LEWIS P. MALOUF**

---

This matter is before the Court on Plaintiff's Motion for Summary Judgment Against Lewis P. Malouf (Doc. # 249), wherein the Securities and Exchange Commission ("Commission" or "SEC") moves for summary judgment against Defendant Lewis P. Malouf on all claims against him. Mr. Malouf filed a response in opposition to the Motion. (Doc. # 260.) For the following reasons, the Motion is granted.

## I.   **BACKGROUND**[1]

In December 2013, the Commission filed this civil action against thirteen defendants and five relief defendants based on their respective roles in fraudulently inducing more than 30 investors to transfer approximately $18 million in cash and approximately $11.4 million in collateralized mortgage obligations ("CMOs") to Golden Summit Investors Group Ltd. ("Golden Summit") and Extreme Capital Ltd. ("Extreme Capital"), entities controlled by Defendant Jesse W. Erwin, Jr., and Daniel Dirk Coddington.[2] No registration statement covering the CMO Trading Program was filed with the Commission by either Golden Summit or Extreme Capital. (Doc. # 273 at 132–33.)

As explained in detail below, Defendant Lewis P. Malouf brought investors into the CMO Trading Program. He held himself out to be Executive Vice President of Extreme Capital and was the Chairman/LLC Manager of Golden Eagle Financial LLC ("Golden Eagle"), a non-defendant entity. Mr. Malouf has never been registered with the

---

[1] Unless otherwise noted, the following facts are undisputed. Herein, the Court rejects Mr. Malouf's attempt to withdraw his Fifth Amendment waiver and strikes his conclusory affidavit (Doc. # 260-2) from the record. Accordingly, to the extent Mr. Malouf relies solely on his stricken affidavit to dispute a fact in the Commission's Motion for Summary Judgment that is properly supported by the record, the fact is deemed undisputed. *See* Fed. R. Civ. P. 56(c)(1)(A) (providing a party asserting that a fact is genuinely disputed must support the assertion by citing to particular materials in the record).

[2] In October 2015, as this case neared the end of discovery, Mr. Coddington and Mr. Erwin were indicted on two counts of securities fraud and thirteen counts of wire fraud stemming from the conduct alleged in this action. *See United States v. Daniel Dirk Coddington and Jesse W. Erwin, Jr.*, No. 15-cr-00383-RBJ (D. Colo., filed Oct. 5, 2015). Ultimately, Mr. Erwin pled guilty to one count of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5, and one count of wire fraud, in violation of 18 U.S.C. § 1343. Mr. Coddington was convicted at trial on all counts, but his conviction was later reversed on the basis that he died while his appeal was pending.

Commission as a broker/dealer or as a person associated with a registered broker/dealer. (Doc. # 273 at 35.) Daniel Coddington wire transferred a total of $76,584 to Mr. Malouf from Golden Summit's Wells Fargo Bank account between November 30, 2011 and March 12, 2012. (*Id.* at 5.)

## A.    MR. MALOUF'S SOLICITATION OF INVESTORS FOR HYPOTHECATION

### 1.    Filipino Heritage Holdings

On or about January 1, 2010, Mr. Malouf sent a letter on behalf of Golden Eagle to Filipino Heritage Holdings and Investments to solicit a Venezuela bond. The letter represented "we are ready, willing and able to perform the hypothecation of the above-cited Venezuela Bond[,]" "[w]e have the funds for the hypothecation of this Bond already posted and waiting at the securities house[,] and "[w]e are prepared to make the funding distributions from the hypothecation within two (2) banking days of receipt and validation . . . ." (Doc. # 273 at 64–65.) The letter was signed by Mr. Malouf.

Three months later, on April 6, 2010, Mr. Malouf emailed former Defendants Curt Geisler and Marshall Gunn to "talk . . . about additional CMO Transactions"[,] stating that

> funding CMOs is not easy and has proven to be more difficult than originally anticipated because those that promise to fund [ ] get nervous and head for the hills[,] and our normal funding partners for all of the other instruments, even Venezuela Bonds, do not want to touch CMOs as they know that the bottom is going to fall out of their value [ ] very soon.

 (*Id.* at 66.)[3]

---

[3] Mr. Malouf filed Objections to the Commission's Appendix of Exhibits Submitted in Support of Its Motion for Summary Judgment, in which he objects to the Declaration of Kerry Matticks and

2.    <u>Blakjak Investments Inc.</u>

On or about May 24, 2010, Mr. Malouf, on behalf of Nevada-based Golden

Eagle, entered into an Asset Purchase Agreement with Blakjak Investments Inc., based

in California. (Doc. # 273 at 67–80.) The agreement provided for Golden Eagle to

purchase a CMO from Blakjak for $10 million and stated "THAT IN THE UNLIKELY

EVENT THAT BUYER IS UNABLE TO PAY SELLER FOR SAID ASSET, SAID ASSET

SHALL, IMMEDIATELY AND WITHIN NO MORE THAN TWO (2) BANKING DAYS, BE

RETURNED TO SELLERS ACCOUNT AT WELLS FARGO INVESTMENTS[.]" It

represented that Golden Eagle had made arrangements with "MAJOR

INTERNATIONAL SECURITIES HOUSES AND BANKS" and had "THE BUSINESS

RELATIONSHIPS WITH THE FUNDING SOURCE SUFFICIENT FOR

PERFORMANCE UNDER THIS AGREEMENT." Blakjak's representative, Jeffrey

Carter, communicated with Mr. Malouf about the agreement and the CMO Trading

Program through email. (Doc. # 273 at 87.) Mr. Malouf told Mr. Carter that he would

transfer the CMO to Golden Summit and Daniel Coddington and that the $10 million

purchase price for Blakjak's CMO would come from an overseas bank. (*Id.* at 89–90.)

Ultimately, Mr. Malouf and Golden Eagle failed to pay Blakjak the promised $10

million for its CMO, failed to hypothecate the CMO, and failed to return the CMO. (*Id.* at

---

Exhibits 1 through 17 and Exhibit 20 of the Commission's Appendix. Pursuant to Fed. R. Civ. P. 56(c)(2), "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Upon consideration of the Objections, the Commission's Response thereto (Doc. # 272), and the Commission's Amended and Supplemental Appendices (Doc. ## 270, 273), the Court finds that the exhibits challenged by Mr. Malouf would be admissible at the trial if tendered in the manner provided by the Commission in its Response. Accordingly, Mr. Malouf's objections are overruled.

91–92.) Mr. Malouf and other defendants made excuses for the delays and their failure to return Blakjak's CMO, including promises that "it's always a day away," and resisted Blakjak's demands that the CMO be returned. (*Id.*)

3.    <u>Financial Services Group LLC</u>

On May 25, 2011, Mr. Malouf, on behalf of Nevada-based Extreme Capital, entered into a Cooperation and Profit Allocation Agreement with Financial Services Group LLC ("Financial Services"), a Florida company. (Doc. # 273 at 94–104.) Mr. Malouf introduced Financial Services to Daniel Coddington, whom Mr. Malouf described as his partner. (*Id.* at 40.)

Under the terms of the agreement with Extreme Capital, Financial Services was to transfer ownership of a CMO it owned, which had a face value of $1 billion, to Extreme Capital. Then, Mr. Malouf and Daniel Coddington would hypothecate the CMO to get a line of credit they could use to invest in the CMO Trading Program. (*Id.* at 40.) Financial Services was to be paid a pre-trade distribution of $1,000,000, net proceeds of $32 million from hypothecation, and total profits through the CMO Trading Program of $2.2 billion. (*Id.* at 48–50.) Under the agreement, if Extreme Capital or its funding source were unable to hypothecate the CMO, the CMO would be immediately returned to Financial Services. (*Id.* at 90.) This promise was material to Financial Services, which would not have entered the agreement and transferred ownership of its CMO without that provision. (*Id.* at 44–45.)

On or about May 25, 2011, Mr. Malouf sent Financial Services' representative, Marcial Baralt, a letter from Daniel Coddington's attorney, Mr. Erwin, that falsely stated

a funding source had approved Financial Services' CMO for funding, had allocated funds, and that all arrangements had been made for the funds received through hypothecation to be invested in the CMO Trading Program. (*Id.* at 105–07.) The letter also represented that, "[u]pon completion of the investment protocols and the repayment of the hypothecation loan, your CMO will be returned to your original account." These representations were material to Financial Services, which would not have transferred its CMO to Extreme Capital but for the guarantees in Mr. Erwin's letter. (*Id.* at 47.)

Financial Services never received any payments from Extreme Capital, Mr. Malouf, or Daniel Coddington, and its CMO was never returned. (*Id.* at 50–51.)

4.     Condor Capital Group LLC

On or about June 20, 2011, Mr. Malouf emailed an Asset Funding Agreement to Condor Capital Group LLC ("Condor"), a Michigan LLC. (Doc. # 273 at 108.) In the Asset Funding Agreement, Extreme Capital and Mr. Malouf (listed as Executive Vice President) agreed to, within two weeks of receipt of Condor's $1-billion-face-value CMO, "ENTER INTO AGREEMENT, WITH THE FUNDING SOURCE, FOR THE PURPOSE OF HYPOTHECATIONS OF SAID ASSETS . . . ." (Doc. # 273 at 110.) The agreement stated that Extreme Capital had pre-arranged relationships with major international securities houses and banks for the hypothecation, promised to immediately return the CMO in the event that hypothecation did not occur, and promised to keep Condor fully informed of all aspects of the transactions described in the Asset Funding Agreement at all times. (*Id.* at 112.) Exhibit A to the Asset Funding

Agreement, which is signed by Mr. Malouf only, provided the terms of the agreement and promised Condor net proceeds of $32 million.

Condor performed under the agreement. On July 11, 2011, Malouf emailed Condor's representative, Laval Perry, that "the CMO has arrived in the account of the funding source and has been cleared so that they can commence their hypothecation process with the target of completing this process and allowing us to make the distributions as set forth in EXHIBIT A" "within approximately one week." (*Id.* at 115–20.) The "Information and Instructions Regarding the Distribution and Use of Funds From the Hypothecation of Instruments" that Mr. Malouf sent to Condor stated that "the Net Loan Proceeds [from hypothecation] will be deployed for the Trade Transactions" in the CMO Trading Program. (*Id.* at 116.)

On July 20, 2011, Mr. Malouf emailed Seth Leyton of Viewpoint Securities, the brokerage firm holding the CMO, that Daniel Coddington was "in the hospital and very sick," that his son Scott Coddington was working on the CMO transactions, and that Mr. Malouf was "the contracting party for both Financial Services Group and with Condor Capital Group." (Doc. # 273 at 121.) Therein, Mr. Malouf asked Mr. Leyton to assist him by providing market valuations for the Financial Services and Condor CMOs. (*Id.* at 121, 129); (Doc. # 260 at 11).

On October 15, 2011, more than three months after Mr. Malouf represented that Condor's CMO was ready for hypothecation, the Condor CMO had not been hypothecated or returned. Mr. Malouf emailed Mr. Perry with further excuses for the delays in hypothecation and profit distribution. (Doc. # 273 at 130–31.) Therein, Mr.

Malouf stated, *inter alia*, that "no one wants anything to do with" Condor's CMO and Mr. Malouf's team "has done all of the work with the funding source, banks, bankers, etc. and has taken all of the shit from everyone as we work through this very difficult situation based on constant downgrades on the CMOs . . ." (*Id.* at 130.) Mr. Malouf also represented that "[i]n the past 3 days, our bankers have processed about 125 wires to clients and brokers, in the order in which they arrived in the transaction . . . . Now, we are almost finished and we need everyone to take a deep breath and allow us the opportunity to complete this funding without the challenges every step of the way." (*Id.*)

## B.    MR. MALOUF'S INVOCATION OF THE FIFTH AMENDMENT

Mr. Malouf gave investigative testimony in connection with this case on March 21, 2013. He was represented by counsel at the time and repeatedly invoked his Fifth Amendment right against self-incrimination. Mr. Malouf was later deposed on July 29, 2015. Mr. Malouf appeared *pro se* at his deposition and again invoked the Fifth Amendment. Counsel for the Commission advised Mr. Malouf of the potential consequences of invoking the Fifth, which Mr. Malouf said he understood:

> Q. . . . I am not authorized to compel you to give any evidence or testimony and it's not my intent to do so. You're free to assert that privilege and state that you refuse to answer any questions on the grounds that it might incriminate you. But you should be aware that if you do refuse to answer a question based on your Fifth Amendment privilege, a judge or a jury may take an adverse inference against you in this action. So that means they would be permitted to infer that if you had answered the question, that answer might tend to incriminate you. Do you understand that?
>
> A. I understand that.

(Doc. # 270 at 9–10.) In particular, Mr. Malouf invoked the Fifth with respect to the

following questions concerning his involvement in the CMO Trading Program:

- whether, on behalf of Extreme Capital, he solicited or assisted in the soliciting of investors in a CMO trading scheme;

- whether, on behalf of Extreme Capital, he prepared trading and loan documents or assisted in the preparation of trading and loan documents for investors related to the trading scheme, including whether he created and sent the Asset Funding Agreement email and attached documents to Condor;

- who the banks and funding sources were with which he had purportedly made arrangements for hypothecations and trading in the CMO Trading Program;

- whether he had any reasonable basis to represent to Laval Perry that Scott Coddington was meeting with banks and funding sources;

- whether he deliberately misled Mr. Perry about those purported meetings; and

- whether he communicated excuses and delays regarding the CMO trading scheme to investors to keep them from discovering that their funds had been diverted and/or their CMOs had been misappropriated.

On January 20, 2016, after Daniel Coddington and Jesse Erwin were indicted, the Court stayed this proceeding "pending resolution of the criminal case, fifth amendment rights, and discovery." (Doc. # 176.) On March 3, 2020, the Court held a hearing and lifted the stay. At the hearing, counsel for Mr. Malouf informed the Court and the Commission that (1) the criminal statute of limitations had passed, and (2) Mr. Malouf was willing to sit for another deposition so that an adverse inference could not

be drawn. The Court set the discovery deadline for April 17, 2020, and the dispositive motion deadline for August 28, 2020. The Commission did not re-depose Mr. Malouf.

## II.   LEGAL STANDARDS

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okl.*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *See id.* However, conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id.* In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out to the Court a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met its initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Id.* Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. Stated differently, the party must provide "significantly probative evidence" that would support a verdict in his favor. *Jaramillo v. Adams Cty. Sch. Dist. 14*, 680 F.3d 1267, 1269 (10th Cir. 2012). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

## III.   DISCUSSION

In its Motion, the Commission moves for summary judgment on all four of its claims against Mr. Malouf—i.e., its First Claim for Relief for engaging in the unregistered offer and sale of securities in violation of Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act"); its Second and Third Claims for Relief for securities fraud in violation of Section 17(a) of the Securities Act and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder; and its Fourth Claim for Relief for acting as an unregistered broker/dealer in violation of Section 15(a) of the Securities Act. The Commission also moves the Court to order disgorgement of Mr. Malouf's ill-gotten gains of $76,584, plus prejudgment interest of $29,313.63, and to impose a third-tier civil penalty against him equal to the amount of his ill-gotten gains.

In opposition to the Motion, Mr. Malouf seeks to withdraw his previous Fifth Amendment waiver and submit an affidavit to rebut the evidence provided by the Commission. For the reasons described herein, the Court rejects Mr. Malouf's attempted withdrawal of his Fifth Amendment waiver and strikes his conclusory affidavit. Finding that the Commission has met its initial burden at summary judgment and that Mr. Malouf has failed to set forth specific facts showing that there is a genuine issue for trial, the Court grants the Motion.

## A.    FIFTH AMENDMENT WAIVER

The privilege against self-incrimination applies in civil proceedings "where the answers might incriminate [the witness] in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973). However, invoking the Fifth Amendment in civil litigation carries two potential consequences. First, the court may draw an adverse inference when a party asserts their right to silence. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them[.]"). Although a motion for summary judgment cannot be granted based on an adverse inference alone, "'[a]n adverse inference may be given significant weight because silence when one would be expected to speak is a powerful persuader.'" *SEC v. Suman*, 684 F. Supp. 2d 378, 386 (S.D.N.Y. 2010) (quoting *LiButti v. United States*, 178 F.3d 110, 120 (2d Cir. 1997)). Second, a court may strike conclusory evidence if the "witness asserts the Fifth Amendment privilege to avoid answering relevant questions, yet freely responds to questions that are advantageous to his cause,"

essentially turning the Fifth Amendment from a shield into a sword. *S.E.C. v. Smart*, 678 F.3d 850, 855 (10th Cir. 2012) (quoting *United States v. $148,840 in U.S. Currency*, 521 F.3d 1268, 1277 (10th Cir. 2008)).  However, these two consequences do not attach when a litigant properly withdraws their plea. *Davis-Lynch*, *Inc. v. Moreno*, 667 F.3d 539 (5th Cir. 2012).

The Tenth Circuit has stated that withdrawal is proper when "there are no grounds for believing that opposing parties suffered undue prejudice from the litigant's later-regretted decision to invoke the Fifth Amendment." *Smart*, 678 F.3d at 855 (quoting *Davis-Lynch*, 667 F.3d at 547). On the other hand, "withdrawal is not permitted if the litigant is trying to 'abuse, manipulate or gain an unfair strategic advantage over opposing parties.'" *Id.* The *Smart* court noted three factors for courts to consider in determining whether withdrawal is proper: (1) whether a party appeared *pro se* at the time of invocation of the privilege; (2) whether the party failed to grasp the consequences of invoking the Fifth Amendment; and (3) whether the opposing party possessed sufficient evidence despite the plea. *Id.* Thus, "a party may withdraw its invocation of the Fifth Amendment privilege, even at a late stage in the process, when circumstances indicate that there is no intent to abuse the process . . . and there is no unnecessary prejudice to the other side." *Davis-Lynch*, 667 F.3d at 548.

In his Response, Mr. Malouf seeks to withdraw his Fifth Amendment waiver and moves the Court to consider his affidavit. In support of his request for withdrawal, Mr. Malouf argues that he appeared *pro se* when he invoked the Fifth Amendment at his

deposition, that he did not use the Fifth Amendment to maniupate the litigation process, and that the SEC will not suffer any unnecessary prejudice from his withdrawal.

First, although Mr. Malouf appeared *pro se* at his deposition in July 2015, he did so after he gave investigative testimony in 2013. During his investigative testimony, he was represented by his current counsel and invoked the Fifth Amendment on the advice of counsel. *See* (Doc. # 273 at 20) ("MR. SWAN: You're going to take the Fifth."). Thus, at the time Mr. Malouf appeared *pro se* at his deposition in July 2015, he had previously been advised of the consequences of invoking the Fifth by his own counsel. He was further advised of a potential adverse inference by the Commission's counsel at the start of his deposition, to which he responded: "I understand that." (Doc. # 270 at 9–10.) The Court is thus in agreement with the Commission that Mr. Malouf's statement that "[a]t the time I asserted my rights against self-incrimination at my deposition, I was not aware of the serious consequences that can attach when a party pleads the Fifth in a civil case[,]"is belied by the record. (Doc. # 260-2 at 7.)

Moreover, as the Tenth Circuit found in affirming the district court's rejection of a defendant's Fifth-Amendment withdrawal request in *Smart*,

> [e]ven if we assume that [Mr. Malouf] was unaware of the potential consequences for invoking the Fifth Amendment at that time, [he] had taken the Fifth on the advice of his own counsel [two years] earlier, during the SEC's investigatory process. Thus, there was ample time for him to become aware of the consequences of re-asserting the Fifth Amendment during the litigation.

*Smart*, 678 F.3d at 855. Therefore, this factor weighs against withdrawal.

Mr. Malouf argues that his willingness to be re-deposed by the Commission in the final six weeks of discovery demonstrates that he had no intent to abuse, manipulate, or gain an unfair strategic advantage over opposing parties. However, undue prejudice to the Commission weighs heavily against withdrawal. Generally, "[t]he court should be especially inclined to permit withdrawal of the privilege if there are no grounds for believing that opposing parties suffered undue prejudice from the litigant's later-regretted decision to invoke the Fifth Amendment." *Smart*, 678 F.3d at 855. Mr. Malouf sought to withdraw his Fifth Amendment waiver only after the death of Daniel Coddington, the only witness who could challenge many material and self-serving statements made in Mr. Malouf's affidavit. For example, Mr. Malouf makes the following statements in his affidavit, which are otherwise uncorroborated by the record:

- "In the summer of 2011, Mr. Coddington contacted me to let me know that he was extremely sick and in the hospital, and he needed someone to execute a few business agreements for him. Mr. Coddington or someone else had already prepared the agreements, and so all I needed to do was sign them. I said that I would help him. Mr. Coddington directed me to list my title as 'Executive Vice President' of Extreme Capital when I executed agreements on his behalf, but I never actually held any position in Mr. Coddington's companies." (Doc. # 260-2 at 5);

- "I never received any compensation, at any time whatsoever, for helping Mr. Coddington while he was very sick." (*Id.* at 7);

- "In late 2011 and early 2012, I encountered financial issues, and Mr. Coddington loaned me money. He transferred funds to me as he had money available, and I later paid him back in cash. I believe the total he loaned me was $66,584, not the $76,584 the SEC claims in its motion. I believe the money he loaned me came from a real estate development project he worked on." (*Id.* at 7–8).

The Commission would be unduly prejudiced by the withdrawal of Mr. Malouf's Fifth Amendment waiver because it would not be able to verify any of Mr. Malouf's testimony

concerning conversations and dealings with Daniel Coddington. Accordingly, Mr. Malouf's request for leave to withdraw his assertion of the Fifth Amendment is denied. His affidavit, which is riddled with conclusory statements, is stricken. *See Smart*, 678 F.3d at 855; *see, e.g.*, (Doc. # 260-2 at 3) (stating "I have never acted as [an] SEC-licensed broker-dealer, or been compensated for doing so. . . ." and "[s]ince approximately 1990, I have not bought or sold a registered or unregistered security[,] . . . had a securities account[,] [or] taken possession of any registered or unregistered security."); (*id.* at 7) (stating "I have never violated any provisions of the SEC rules and regulations, and certainly never had the intent to do so. I have always followed the law, and nothing the SEC has asserted in its motion proves otherwise.").

**B.    LIABILITY**

For the following reasons, the Court concludes that the Commission has established Mr. Malouf's violations of Sections 5(a) and (c) of the Securities Act, Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder, and Section 15(a) of the Securities Act, and that summary judgment is, therefore, warranted on the Commission's First through Fourth Claims for Relief. The Court also grants the Commission's requests for disgorgement, prejudgment interest, and a third-tier civil penalty.

1.    Adverse Inferences

During his investigative testimony and deposition, Mr. Malouf asserted his Fifth Amendment privilege with regard to most questions concerning the Commission's material allegations in this case. Accordingly, the Court draws adverse inferences

against Mr. Malouf in connection with his refusal to answer questions concerning the following topics: (1) whether, on behalf of Extreme Capital, he solicited or assisted in the soliciting of investors in a CMO trading scheme, including whether he created and sent an email including an Asset Funding Agreement to Condor Capital Group LLC; (2) whether, on behalf of Extreme Capital, he prepared trading and loan documents or assisted in the preparation of trading and loan documents for investors related to the trading scheme; (3) whether he had any reasonable basis to represent to Condor's Laval Perry that Scott Coddington was meeting with banks and funding sources, and whether he deliberately misled Mr. Perry about those purported meetings; and (4) whether he communicated excuses and delays regarding the CMO trading scheme to investors to keep investors from discovering that their funds had been diverted and/or their CMOs had been misappropriated. *See generally* (Doc. # 273 at 10–36).

> 2. Claim One - Violation of Sections 5(a) and (c) of the Securities Act by Engaging in the Unregistered Offer and Sale of Securities

To establish a *prima facie* case for a violation of Sections 5(a) and 5(c), the Commission must prove that (1) the defendant offered to sell or sold a security; (2) using the mails or interstate means; and (3) no registration statement was filed, or in effect, as to the security. *SEC v. Gordon*, 522 F. Appx. 448, 450 (10th Cir. 2013). The Commission is not required to prove scienter. *See SEC v. Softpoint*, 958 F. Supp. 846, 859–60 (S.D.N.Y. 1997). After the Commission has established a *prima facie* case, the burden of proof shifts to the defendant to show that an exemption, or safe harbor, from

registration was available for the offer or sale of the security. *See SEC v. Ralston Purina Co.*, 346 U.S. 119, 124–26 (1953).

First, the Commission has demonstrated that investments in the CMO Trading Program constitute securities. The term "security" is defined to include any "stock," "bond," "or "investment contract." 15 U.S.C. §§ 77b(a)(1), 78c(a)(10). In determining whether a financial relationship constitutes an investment contract, courts consider "whether the scheme involves [1] an investment of money [2] in a common enterprise [3] with profits to come solely from the efforts of others.'" *Uselton v. Commercial Lovelace Motor Freight, Inc.*, 940 F.2d 564, 572 (10th Cir. 1991) (quoting *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946)). The investments offered by Golden Summit and Extreme Capital required the investment of money or CMOs in the CMO Trading Program, where the investors, Golden Summit and Extreme Capital, were to share profits that resulted from the trading activities of Golden Summit. Thus, the investments in the CMO Trading Program constitute investment contracts as defined in *Uselton* and *Howey*. They are, therefore, securities under the Securities Act.

Further, the Commission has demonstrated that Mr. Malouf offered and sold securities to Blakjak on or about May 24, 2010, to Financial Services on or about May 25, 2011, and to Condor on or about June 20, 2011. Mr. Malouf's offer and sale of securities used interstate commerce and the mail; Mr. Malouf sent emails, documents, and letters to California-based Blakjak, Florida-based Financial Services, and Michigan-based Condor. No registration statement was filed in connection with the CMO Trading

Program, and Mr. Malouf has not demonstrated that any registration exemption would apply to his sale of securities in the CMO Trading Program.

Accordingly, the Commission has met its burden of demonstrating that no genuine issues of material fact remain for trial with respect to this claim, and summary judgment is appropriate.

3.   Claims Two and Three - Violation of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder

a.   *Applicable law*

In an SEC enforcement action, the elements of securities fraud under Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act are effectively the same. To prove a claim under Section 17(a) of the Securities Act or Section 10(b) of the Exchange Act, the Commission must show that the defendant directly or indirectly, in the offer or sale of securities, by use of interstate commerce or the mails, did one or more of the following: (a) employed a device, scheme, or artifice to defraud; (b) obtained money or property by means of an untrue statement of material fact or by omitting to state a material fact that made what was said, under the circumstances, misleading; or (c) engaged in a transaction, practice, or courses of business that operated as a fraud or deceit upon the purchaser of securities. 15 U.S.C. § 77q(a).[4] The SEC must show that a defendant acted with scienter for violation of Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act, or negligently for Sections

---

[4] *See S.E.C. v. Wolfson*, 539 F.3d 1249, 1256 (10th Cir. 2008) ("a defendant is liable under § 10(b) if the Commission establishes that he (1) made a misrepresentation or omission (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities; and (5) by virtue of the requisite jurisdictional means.").

17(a)(2) and (3) of the Securities Act. *See In re Level 3 Communications, Inc. Sec. Lit.*, 667 F.3d 1331, 1343, n.12 (10th Cir. 2012).

        *b.*     *Analysis*

            *i.*     *Mr. Malouf made misrepresentations of material fact*

A statement or omission is material if a reasonable investor would consider it important in determining whether to buy or sell the security, and if it would have significantly altered the total mix of information available to investors. *City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1265 (10th Cir. 2001). The undisputed facts show that Mr. Malouf made misrepresentations of material fact with respect to the CMO Trading Program.

The Commission has demonstrated that Mr. Malouf solicited CMOs from at least three investors: Blakjak, Financial Services, and Condor Capital.[5] In doing so, he misrepresented his position within Extreme Capital,[6] his ability to arrange hypothecation of CMOs, his relationships with banks and funding sources, and his intent to promptly return any CMOs that he was unable to hypothecate. In actuality, Mr. Malouf had no relationships with banks or brokerages, had no ability to hypothecate CMOs, and did not

---

[5] The Court agrees with Mr. Malouf that genuine disputes exist with respect to whether his solicitation of a Venezuela bond from Filipino Heritage Holdings was in connection with the CMO Trading Program and constituted securities fraud. However, this does not preclude summary judgment on the Commission's Second and Third Claims for Relief because the Commission has demonstrated that there are no genuine disputes with respect to Mr. Malouf's conduct concerning the remaining three investors—Blakjak, Financial Services, and Condor.

[6] Mr. Malouf concedes that he "list[ed] his title as 'Executive Vice President' of Extreme Capital" in the hypothecation agreements with Financial Services and Condor despite having "never actually held any position in Mr. Coddington's companies." (Doc. # 260 at 15.)

return the CMOs placed in the CMO Trading Program. These misstatements were material and caused Financial Services and Condor to transfer their CMOs to the CMO Trading Program. *See* (Doc. # 273 at 43–44 (explaining that Financial Services would not have transferred ownership of its CMO without certain promises in the agreement)). The CMOs were never returned. (*Id.* at 50–51, 130–31.)

### ii.    Mr. Malouf acted with scienter

The term "scienter" refers to "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). "Scienter" encompasses knowing or intentional misconduct, as well as recklessness, which is "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it[.]" *City of Philadelphia*, 264 F.3d at 1258 (quoting *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1232 (10th Cir. 1996)).

There is no genuine dispute that Mr. Malouf acted with scienter and was, at least, reckless in connection with his solicitation of investors in the CMO Trading Program. As of April 6, 2010, Mr. Malouf knew that funding CMOs was "more difficult than originally anticipated because those that promise to fund [ ] get nervous and head for the hills and our normal funding partners . . . do not want to touch CMOs . . . . ." (Doc. # 273 at 66.) Despite this knowledge, he represented to Blakjak, Financial Services, and Condor that their CMOs could be hypothecated promptly, that he had banks and funding sources ready to hypothecate those CMOs, and that the funds would be invested in an offshore

trading program. Mr. Malouf's April 2010 email, coupled with his failure to hypothecate or return the Blakjak CMO as of May 2010, rendered him without any reasonable basis to represent to Financial Services and Condor in May and June of 2011 that he and Extreme Capital were ready, willing, and able to hypothecate their CMOs and that the CMOs would be returned immediately if hypothecation was not possible. This conclusion is supported by Mr. Malouf's invocation of the Fifth Amendment when asked questions concerning who the banks and funding sources were with which he had purportedly made arrangements for hypothecations and trading in the CMO Trading Program, as well as whether he had any reasonable basis to represent to Condor's Laval Perry that Scott Coddington was meeting with banks and funding sources.

Moreover, the Commission has demonstrated that Mr. Malouf engaged in lulling activity, which is evidence of scienter. *Commodity Futures Trading Comm'n v. Financial Tree*, No. 2:20-CV-01184-TLN-AC, 2020 WL 3893390, at *8 (E.D. Cal. July 2, 2020) (citing *SEC v. Holschuh,* 694 F.2d 130, 144 (7th Cir. 1982) ("The court was entitled to consider the lulling activities because they were evidence of a scheme . . . and was relevant to the question of intent.")). More than three months after Mr. Malouf represented that Condor's CMO was ready for hypothecation, Mr. Malouf emailed Condor's representative with excuses for the delays in hypothecation, blaming the devaluation of Condor's CMO and representing that Mr. Malouf's team was "almost finished and [needed] everyone to take a deep breath and allow [them] the opportunity to complete this funding without the challenges every step of the way . . . ." (Doc. # 273 at 130–31.). Further, Mr. Malouf joined other defendants in making excuses for delays

and failure to return Blakjak's CMO, including promises that hypothecation was always a day away and resistance to Blakjak's demands that its CMO be returned. (*Id.* at 91–92.)

Mr. Malouf's continued misreprentations to investors, failure to return CMOs as promised, and lulling activities demonstrate that he acted with scienter.

iii.    *Mr. Malouf acted in connection with the purchase or sale of securities*

"The Supreme Court has consistently embraced an expansive reading of § 10(b) [of the Exchange Act's] 'in connection with' requirement." *S.E.C. v. Wolfson*, 539 F.3d 1249, 1262 (10th Cir. 2008); *see, e.g.*, *SEC v. Zandford*, 535 U.S. 813, 819 (2002) ("in connection with" requirement of Section 10(b) and Rule 10b-5 of the Exchange Act includes situations where broker accepts payment for securities that he never intends to deliver). Likewise, the statutory language of Section 17(a) of the Securities Act "has been broadly construed to encompass a wide range of conduct." *SEC v. Chester Holdings, Ltd.*, 41 F. Supp. 2d 505, 518 (D.N.J. 1999) (quoting *SEC v. Antar*, 15 F. Supp. 2d 477, 528 (D.N.J. 1998)).

The Tenth Circuit has held that the "in connection with" element requires only that there be "a causal connection between the allegedly deceptive act or omission and the alleged injury." *Arst v. Stifel, Nicolaus & Co., Inc.,* 86 F.3d 973, 977 (10th Cir. 1996). In cases involving documents "designed to reach investors and to influence their decisions to transact in a publicly-traded security, any misrepresentations contained within the documents are made 'in connection with' the purchase or sale of that

security." *Wolfson*, 539 F.3d at 1262. Thus, to satisfy the "in connection with" element, the Commission "need only show that the documents are reasonably calculated to influence investors, and that the misrepresentations are material to an investor's decision to buy or sell the security." *Id.*

As analyzed above, Mr. Malouf made material misstatements to investors, in written agreements and emails, in order to solicit investors into the CMO Trading Program. Pursuant to *Wolfson*, Mr. Malouf acted "in connection with the purchase or sale of any security" for purposes of Section 10(b) and Rule 10b-5, and "in the offer or sale of any securities" for purposes of Section 17(a). 539 F.3d at 1262.

*iv.   Mr. Malouf used interstate commerce*

Interstate commerce is given a "broad interpretation in the application of the federal securities laws." *SEC v. Langford*, 2011 WL 13228240, *3 n.3 (N.D. Ala. Aug. 8, 2011). As described above, Mr. Malouf sent emails, documents, and letters to investors in California, Florida, and Michigan, thereby using interstate commerce.

Accordingly, the Commission has demonstrated that there are no genuine issues of material fact and summary judgment is warranted on its Second and Third Claims for Relief.

4.   <u>Claim Four – Violation of Section 15(a) of the Exchange Act</u>

Section 15(a)(1) of the Exchange Act makes it unlawful for any broker or dealer to use jurisdictional means, such as the telephone or mails, to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security unless such broker or dealer (1) is registered with the SEC; (2) in the case of a natural person, is an

associated person of a registered broker/dealer; or (3) satisfies the conditions of a safe harbor or exemption. It is undisputed that Mr. Malouf is not registered with the SEC as a broker, is not associated with a registered broker/dealer, and does not qualify for a safe harbor or exemption. Mr. Malouf opposes summary judgment on this claim on the basis that he is not a "broker" or "dealer" under the statute.

Section 3(a)(4) of the Exchange Act defines a broker as "any person engaged in the business of effecting transactions in securities for the account of others." The phrase "engaged in the business" connotes "a certain regularity of participation in securities transactions at key points in the chain of distribution." *Massachusetts Fin. Serv., Inc. v. Sec. Investor Prot. Corp.,* 411 F. Supp. 411, 415 (D. Mass.1976), *aff'd*, 545 F.2d 754 (1st Cir. 1976); *see also SEC v. George*, 426 F.3d 786, 793 (6th Cir. 2005) (affirming summary judgment order finding an unregistered defendant violated Section 15(a) by soliciting "numerous investors to purchase securities" in fraudulent offerings, holding himself out as an intermediary, and receiving "transaction-related compensation in the form of investors' money," which he misappropriated).

In the Tenth Circuit, courts consider the following factors in determining whether a person acts as a broker or dealer: (i) whether the person works as an employee of the securities' issuer; (ii) whether he receives a commission rather than a salary; (iii) whether he sells or has sold the securities of another issuer; (iv) whether he participates in negotiations between the issuer and investor; (v) whether he provides advice or a valuation as to the merit of an investment; and (vi) whether he actively, rather than passively, finds investors. *Sun River Energy, Inc. v. Nelson*, No. 11-CV-00198-MSK-

MEH, 2013 WL 1222391, at *5 (D. Colo. Mar. 25, 2013). "Some courts have given particular weight to the factor of whether the person regularly participates in securities transactions at key points; others have deemed transaction-based compensation to be 'one of the hallmarks' of a broker." *Id.* Although there are numerous factors relevant to a determination of whether an individual acts as a broker under the Exchange Act, all factors need not be satisfied. *See SEC v. Hansen*, No. 83 Civ. 3692, 1984 U.S. Dist. LEXIS 17835, at *26 (S.D.N.Y. Apr. 6, 1984).

On balance, and upon consideration of the undisputed facts in the summary judgment record, the foregoing factors weigh strongly in favor of finding that Mr. Malouf acted as a broker.

With respect to the first factor, it is undisputed that Mr. Malouf held himself out as Extreme Capital's Executive Vice President to both Financial Services and Condor. The second factor is neutral because the Commission has not established whether the investors' funds transferred to Mr. Malouf from Golden Summit's bank account were intended as a commission. As to the third factor, as established above, Mr. Malouf sold securities—i.e., investment contracts to participate in the CMO Trading Program—to at least Financial Services and Condor. With respect to the fourth factor, it is undisputed that Mr. Malouf participated in the negotiations between Golden Summit/Extreme Capital and the investors; he admits to having signed agreements and communicated with Financial Services and Condor on Mr. Coddington's behalf.

Turning to the fifth factor, it is undisputed that Mr. Malouf emailed Seth Leyton to ask for a valuation of the Condor and Financial Services CMOs. Finally, Mr. Malouf's

conduct establishes that he actively found investors; Mr. Malouf introduced Financial

Services to Daniel Coddington, emailed hypothecation agreements to both Condor and

Financial Services, executed those agreements on behalf of Extreme Capital, sent

Marcial Baralt a letter from Mr. Erwin that falsely confirmed promises Mr. Malouf had

made, applied pressure to Mr. Baralt to enter the agreement and transfer his CMO with

haste, and stated that he was "the contracting party for both Financial Services Group

and with Condor Capital Group."  (Doc. # 273 at 121.) Accordingly, the aforementioned

factors weigh heavily in favor of a finding that Mr. Malouf acted as a broker for Extreme

Capital/Golden Summit.

        As discussed in the context of the Commission's First through Third Claims for

Relief, there is no genuine dispute with respect to whether Mr. Malouf used jurisdictional

means to effect any transaction in, or to induce or attempt to induce the purchase or

sale of, any security. Accordingly, summary judgment on this claim is appropriate.

## C.     DISGORGEMENT

        The Court has authority to order disgorgement under Section 21(d)(5) of the

Exchange Act, 15 U.S.C. § 78u(d)(5). In *Liu v. SEC*, 140 S. Ct. 1936, 1940 (2020), the

Supreme Court affirmed a district court's authority to order disgorgement under Section

21(d)(5) "that does not exceed a wrongdoer's net profits and is awarded for victims."

The Court stated that the "equitable nature of the profits remedy generally requires the

SEC to return a defendant's gains to wronged investors for their benefit," joint and

several liability for disgorgement must comport with equitable principles, and

disgorgement must be limited to a defendant's net profits, excluding legitimate expenses. *Id.* at 1948–50.

The Commission moves the Court to order disgorgement of Mr. Malouf's net profits of $76,584 from the securities fraud. The Commission has set forth, in the Declaration of Kerry Matticks, that Mr. Malouf received a total of $76,584 in connection with the CMO Trading Program through two wire transfers by Daniel Coddington from Gold Summit's Wells Fargo bank account.[7] (Doc. # 273 at 5.) The first wire transfer took place in November 2011 in the amount of $24,584. The second took place in March 2012 in the amount of $52,000. The Court finds that disgorgement in the amount of $76,584 would be for the benefit of wronged investors and would be consistent with equitable principles and *Liu.*

Mr. Malouf argues that disgorgement is unwarranted because he "recalls borrowing money from Mr. Coddington, which he repaid over time," but that money was a personal loan, not payment for services. (Doc. # 260 at 26.) However, Mr. Malouf cites only to his affidavit to support this assertion, notably failing to provide bank records or any other kind of evidence to support his claim. As the Court has stricken his affidavit herein, Mr. Malouf's assertions that he received the funds from Daniel Coddington as a personal loan, and that he subsequently repaid those funds, are unsupported by the summary judgment record.

---

[7] The Court has previously found that, in October and November of 2010, three investors wire transferred $1,324,983 to Golden Summit's bank account, and $4.2 million in investors' funds were sent to Golden Summit's bank account by way of Mr. Erwin's escrow account. (Doc. # 293 at 3 (citing (Doc. # 251 at 7).)

Additionally, although Mr. Malouf asserts that he "had no belief" that the ill-gotten funds he received "came from anything other than legitimate funds," courts have ordered disgorgement of ill-gotten funds where the recipient had no knowledge of the fraud. *See, e.g.*, *S.E.C. v. Cavanagh*, 155 F.3d 129, 137 (2d Cir. 1998) (explaining that to hold a relief defendant has a legitimate claim to an ill-gotten gift "would allow almost any defendant to circumvent the SEC's power to recapture fraud proceeds[ ] by the simple procedure of giving [the proceeds] to friends and relatives, without even their knowledge.")). Accordingly, the Court finds that the requested disgorgement is warranted and consistent with *Liu*.

**D.    PREJUDGMENT INTEREST**

Generally, disgorgement includes prejudgment interest to ensure that wrongdoers do not profit from their illegal conduct. *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1105 (2d Cir. 1972); *SEC v. Cross Fin. Servs.*, 908 F. Supp. 718, 734 (C.D. Cal. 1995). In this case, the Commission moves the Court to order Mr. Malouf to pay prejudgment interest on both the first, $24,584.00 payment received from Golden Summit for the period of November 30, 2011, the date of receipt, through September 30, 2020, and the second, $52,000 payment received from Golden Summit for the period of March 12, 2012, through September 30, 2020. *See* (Doc. # 249 at 240); (Doc. # 273 at 5). Mr. Malouf did not respond to the Commission's request for prejudgment interest.

Upon consideration of the Motion, the case file, and the facts and circumstances before the Court, the Court agrees that an award of prejudgment interest is appropriate

in this case. Calculating prejudgment interest at the rate used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2), the total amount of prejudgment interest owed by Mr. Malouf is $29,313.63. (*Id.*)

## E.   CIVIL PENALTY

The Court may assess civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3). The penalty provisions applicable in civil actions provide that a penalty may be imposed for each violation of up to the amount of the gross pecuniary gain to the defendant, or for up to the amount of one of three tiers of penalty, whichever is greater. A second-tier penalty applies to a violation that involves "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." *See* § 20(d)(2)(B), § 21(d)(3)(B)(ii). For a third-tier penalty, the violation must also have "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *See* § 20(d)(2)(C), § 21(d)(3)(B)(iii)(aa)-(bb).

In this case, the Commission seeks a third-tier civil penalty against Mr. Malouf in the amount of his ill-gotten gains, asserting that such a penalty would provide appropriate punishment and deterrence in light of Mr. Malouf's conduct and would be comparable to penalties assessed against other defendants who solicited investors into the CMO Trading Program. *See* (Doc. # 226 (imposing a $150,000 penalty against Defendant Merlyn Curt Geisler)); (Doc. # 228 (imposing a $50,000 penalty against

Defendant Marshall Gunn)). Mr. Malouf did not respond to the Commission's request for a civil penalty.

Upon consideration of the Motion, the case file, and the facts and circumstances before the Court, the Court agrees that a third-tier civil penalty against Mr. Malouf is appropriate. Mr. Malouf made multiple, material misrepresentations in soliciting CMOs from investors who lost tens of millions of dollars in the CMO Trading Program. His fraud, deceit, and manipulation directly or indirectly resulted in substantial losses, thereby meriting a third-tier civil penalty of $76,584.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, it is ORDERED as follows:

- Lewis P. Malouf's Objections to Securities and Exchange Commission's Appendix of Exhibits Submitted In Support of its Motion for Summary Judgment (Doc. # 261) are OVERRULED;

- Plaintiff's Motion for Summary Judgment Against Lewis P. Malouf (Doc. # 249) is GRANTED;

- summary judgment shall enter in favor of Plaintiff Securities and Exchange Commission and against Defendant Lewis P. Malouf on Plaintiff's First Claim for Relief for engaging in the unregistered offer and sale of securities in violation of Sections 5(a) and (c) of the Securities Act; its Second and Third Claims for Relief for securities fraud in violation of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; and its Fourth Claim for Relief for acting as an

unregistered broker/dealer in violation of Section 15(a) of the Securities

Act;

- Mr. Malouf is hereby ORDERED to pay $76,584 in disgorgement,

  $29,313.63 in prejudgment interest, and a third-tier civil penalty of

  $76,584, totaling $182,481.63; and

- judgment shall enter against Mr. Malouf in the amount of $182,481.63.

DATED: August 25, 2021

BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge