**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 13-cv-03363-CMA-KLM

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

v.

JESSE W. ERWIN, JR.,

    Defendant, and

DANIEL SCOTT CODDINGTON,

    Relief Defendant.

---

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
AS TO DANIEL SCOTT CODDINGTON**

---

    This matter is before the Court on Plaintiff Securities and Exchange Commission's ("SEC") claim for disgorgement against Relief Defendant Daniel Scott Coddington ("Scott Coddington"). The Court held an evidentiary hearing on the matter on January 6, 2022. After considering the evidence, applicable portions of the record, and the parties' proposed Findings of Facts and Conclusions of Law, the Court enters its findings of fact and conclusions of law and orders Scott Coddington to pay $136,000 in disgorgement, in addition to the $66,738.57 previously ordered, for a total of $202,738.57. (Doc. # 293 at 19.)

I.  **BACKGROUND**

In December 2013, the SEC initiated this civil action against 13 defendants and five relief defendants based on their respective roles in fraudulently inducing more than 30 investors to transfer approximately $18 million in cash and approximately $11.4 million in collateralized mortgage obligations ("CMOs") to entities controlled by Defendants Jesse Erwin and Daniel Coddington, who is now deceased.[1] *See* (Doc. # 1.) From at least July 2010 through July 2011, Defendants offered and sold securities in the form of investment contracts with Golden Summit Investors Group Ltd. ("Golden Summit") and Extreme Capital Ltd. ("Extreme Capital") to participate in a "CMO Trading Program." (Doc. # 293 at 2.) Daniel Coddington controlled both Golden Summit and Extreme Capital and was the architect of the underlying fraudulent scheme. (Doc. # 321 at 3–4.)[2] All but one investor lost their entire investment as a result of Defendants' fraudulent misrepresentations. (Doc. # 293 at 2–3.)

After several years of litigation, all that remains to be resolved in this case is the SEC's claim for disgorgement against Relief Defendant Scott Coddington, Daniel Coddington's son. The SEC has not accused Scott Coddington of any wrongdoing.

---

[1] In October 2015, Daniel Coddington and Mr. Erwin were indicted on two counts of securities fraud and thirteen counts of wire fraud stemming from the conduct alleged in this action. (Doc. # 292 at 2 n.2.) Mr. Erwin pled guilty to one count of securities fraud and one count of wire fraud and was sentenced to 58 months of imprisonment. Daniel Coddington was convicted at trial on all counts, but his conviction was later reversed on the basis that he died while his appeal was pending.

[2] The transcript for the evidentiary hearing has been filed in two parts. (Doc. ## 318, 321.) The Court cites to the docket number (*e.g.*, Doc. # 318) and the page number of the transcript (*e.g.*, Doc. # 318 at 175).

2

Rather, the SEC asserts that Scott Coddington was unjustly enriched when he received proceeds from his father's fraudulent scheme to which he has no legitimate claim. Accordingly, the SEC has named Scott Coddington as a relief defendant and seeks an order requiring him to disgorge any ill-gotten funds he received from the underlying securities fraud.

The parties filed cross-motions for summary judgment on the SEC's claim for disgorgement against Scott Coddington on September 18, 2020. (Doc. ## 251, 253.) The parties disputed whether Scott Coddington has a legitimate claim to several categories of funds, including $108,000 in purported salary payments from Extreme Capital; $45,000 in cash gifts from Daniel Coddington; a $28,000 withdrawal from Extreme Capital to purchase a Honda Odyssey minivan; $59,517.23 in payments for four auto loans in Scott Coddington's name made by Extreme Capital and Golden Summit; $21,738.57 in tuition payments made to the school Scott Coddington's children attended from Extreme Capital and Coddington Family Trust; and $120,509.10 in monthly cash withdrawals from Coddington Trust. (Doc. # 293 at 13.)

On August 10, 2021, the Court issued an Order (Doc. # 293) granting in part and denying in part both summary judgment motions. The Court granted the SEC's Motion (Doc. # 251) and entered summary judgment in the SEC's favor with respect to $45,000 in cash gifts that Scott Coddington received from his father and $21,738.57 in tuition payments made to the school Scott Coddington's children attended. (Doc. # 293 at 14.) As such, the Court ordered Scott Coddington to pay $66,738.57 in disgorgement. (*Id.* at 19.) The Court also granted summary judgment in Scott Coddington's favor with respect

3

to $120,509.10 in monthly cash withdrawals from Coddington Trust. (*Id.* at 15–16.) However, the Court determined that genuine disputes of material fact precluded summary judgment as to the remaining categories of funds. (*Id.* at 16.) The Court therefore denied both summary judgment motions in all other respects (*id.* at 18) and set an evidentiary hearing to determine whether Scott Coddington has a legitimate claim to (1) $108,000 in purported salary payments, (2) $28,000 used to purchase a Honda Odyssey, and (3) $58,517.23 in auto loan payments (Doc. # 294).

The Court held an evidentiary hearing on January 6, 2022. (Doc. # 314.) At the hearing, the Court heard testimony from three witnesses: SEC Accountant Kerry Matticks, Scott Coddington, and Janae Coddington, Scott Coddington's wife. (*Id.*) The Court also admitted into evidence 86 exhibits. (*Id.*) At the end of the hearing, the Court took the matter under advisement and ordered the parties to submit briefing on the admissibility of Exhibit 90 and file proposed findings of fact and conclusions of law. (*Id.*) The parties filed their Proposed Findings of Fact and Conclusions of Law on April 6, 2022. (Doc. ## 323, 324.)

## II.   LEGAL STANDARDS

The SEC is authorized by both the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act") to bring civil enforcement actions seeking equitable relief in the form of injunctions against those committing violations of the Acts. *See* 15 U.S.C. §§ 77t(b), 78u(d)(1). In such actions, federal courts may grant "any equitable relief that may be appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5).

4

Disgorgement is well-recognized as a form of "equitable relief" that "prevents defendants from circumventing 'the SEC's power to recapture fraud proceeds by the simple procedure of giving those proceeds to friends and relatives.'" *SEC v. United Am. Ventures, LLC*, No. 10-cv-568, 2012 WL 13080160, at *8 (D.N.M. Mar. 2, 2012) (brackets omitted) (quoting *SEC v. Cavanaugh*, 155 F.3d 129, 136 (2d Cir. 1998)). Courts "have broad equitable powers to order disgorgement from third parties who have received the proceeds of another's violation of securities laws if the party in possession of the proceeds has no legitimate claim to it." *SEC v. End of the Rainbow Partners, LLC*, No. 17-cv-02670-MSK, 2020 WL 597527, at *4 (D. Colo. Feb. 7, 2020) (citing *SEC v. World Cap. Mkt., Inc.*, 864 F.3d 996, 1003–04 (9th Cir. 2017)). In such circumstances, non-violating third parties are referred to as "relief defendants" or "nominal defendants."

To establish a claim for disgorgement against a relief defendant, the SEC must show that the relief defendant: 1) received ill-gotten funds; and 2) does not have a legitimate claim to those funds. *SEC v. Cherif*, 933 F.2d 403, 414 (7th Cir. 1991). Because of the non-interested status of the relief defendant, there is no claim against him, and it is unnecessary to obtain subject matter jurisdiction over him once jurisdiction over the defendant is established. *Id.*; *Farmers' Bank v. Hayes,* 58 F.2d 34, 36 (6th Cir. 1932).

### III.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court finds that the SEC has satisfied its burden with respect to (1) the $108,000 in purported salary payments and (2) the $28,000 used to purchase the Honda Odyssey. However, the Court finds that disgorgement of the $59,517.23 in funds

used for repayment of four automobile loans is not authorized because the SEC has not established that Scott Coddington profited or benefited from those funds.

### A.     $108,000 IN SALARY PAYMENTS AND $28,000 FOR HONDA ODYSSEY

The Court adopts, and incorporates by reference, the SEC's proposed findings of fact and conclusions of law with regard to the $108,000 in claimed salary payments and $28,000 withdrawal for the Honda Odyssey. (Doc. # 323 at ¶¶ 1–45, 47–137, 139–157.) The SEC's findings of fact are well-supported by the record, and its conclusions of law are proper with respect to the law on disgorgement. To summarize:

  1.     <u>$108,000 in Salary Payments</u>

- Between December 2, 2010, and May 3, 2012, Scott Coddington withdrew eighteen, $6,000 payments from Extreme Capital's Wells Fargo account ending in 7064 ("WFB 7064"), for a total of $108,000.[3] (*Id.* at ¶ 10.)

- Scott Coddington received ill-gotten funds by withdrawing the $108,000 because Extreme Capital's WFB 7064 account was funded with defrauded investors' money. (*Id.* at ¶¶ 5–28.)

- Scott Coddington testified that he received the $108,000 as compensation for serving as his father's personal assistant. He asserted that his job responsibilities included making bank transactions, completing account

---

[3] Scott Coddington disputes that he received one of the $6,000 payments in April 2011 and claims instead that he gave the funds to his father as he typically received only one $6,000 payment per month. However, in responding to requests for admissions, Scott Coddington admitted that he received the second April payment. He produced no evidence such as receipts from his father or bank records to corroborate his statement that he gave the second April payment to his father. The Court finds that Scott Coddington received the second April 2011 payment of $6,000. (Doc. # 323 at ¶ 139.)

6

applications, purchasing office supplies, and organizing a storage unit for a few days. (*Id.* at ¶ 140.) However, Scott Coddington also testified that he spent 20 to 30 hours per week in his father's office and "just worked on real estate stuff" relating to Pulse Real Estate, Scott Coddington's real estate business. (*Id.* at ¶ 141.)

- The Court does not find Scott Coddington's testimony credible that he received $6,000 per month for serving as his father's personal assistant while Scott Coddington operated his real estate business from his father's home office, from which he made $480,099 income during that time. (*Id.* at ¶ 145.)

- The SEC submitted Exhibit 90, an excerpt of sworn testimony from Daniel Coddington's criminal trial, in which Daniel Coddington testified that he gave the money to Scott Coddington to help Scott build his real estate business. (*Id.* at ¶ 146.) Scott Coddington objects to admitting Exhibit 90 as hearsay, and the parties submitted briefs on the admissibility of Exhibit 90. (Doc. ## 315, 316.) The Court finds that Daniel Coddington's testimony is admissible under Fed. R. Evid. 804(a)(4) because Daniel Coddington was unavailable to testify at the hearing because he was deceased. (Doc. # 323 at ¶ 148.) Further, the testimony is admissible as an exception to the rule against hearsay under Rule 804(b)(3) because Daniel Coddington's testimony at his criminal trial regarding using investors' funds to pay Scott Coddington to help Scott establish a real estate business was a statement against interest that subjected Daniel Coddington to criminal liability*.* (*Id.*)

7

- Scott Coddington performed occasional tasks as a personal assistant to his father, but Scott Coddington did not know the nature of Extreme Capital's business and was not an employee of Extreme Capital. (*Id.* at ¶¶ 54–56.) Further, Scott Coddington did not receive tax documents for his income from Extreme Capital: His 2010, 2011, and 2012 tax returns do not contain a Form W-2 or Form 1099 from Extreme Capital listing the income that Scott Coddington purportedly received as salary. (*Id.* at ¶¶ 69, 73, 79.) The Court finds that Scott Coddington's limited activities as a personal assistant for his father do not constitute "services" or other sufficient consideration for the $108,000 that he withdrew from Extreme Capital's account. (*Id.* at ¶ 112.)
- The Court finds that Scott Coddington lacks a legitimate claim to the $108,000 that he received as purported salary payments and that these payments were gifts from his father to help him develop his real estate business. It was improper for Daniel Coddington to pay these sums to Scott Coddington from Extreme Capital's account because Scott Coddington did not provide services or other consideration to Extreme Capital. Scott Coddington shall disgorge the $108,000 in purported salary payments. (*Id.* at ¶ 154.)

2. $28,000 for Honda Odyssey

- Scott Coddington withdrew $28,000 from the Extreme Capital bank account on July 6, 2011, in the form of a cashier's check to purchase a 2008 Honda Odyssey minivan from a seller in Omaha, Nebraska. (*Id.* at ¶¶ 29, 31.)

8

- The Court does not find credible the testimony of Scott Coddington or his wife, Janae Coddington, that they repaid the $28,000 to Daniel Coddington in cash on the same day that Daniel Coddington withdrew the funds from Extreme Capital's bank account. (*Id.* at ¶ 156.)
- The Court finds that Scott Coddington has no legitimate claim to the $28,000 and shall disgorge that amount.

In short, the Court finds that the SEC has proved by a preponderance of the evidence that Scott Coddington received ill-gotten funds and had no legitimate claim to the $108,000 in purported salary payments and the $28,000 withdrawal to purchase a Honda Odyssey.

### B. $59,517.23 FOR REPAYING FOUR AUTO LOANS

The SEC also seeks disgorgement of $59,517.23 in payments made from Extreme Capital's and Golden Summit's bank accounts for four auto loans in Scott Coddington's or his wife Janae Coddington's names. The SEC established that these payments were made from investors' funds obtained through the underlying securities fraud and that Scott Coddington had no legitimate claim to those funds. However, the Court finds that disgorgement is not authorized under *Liu v. SEC*, 140 S. Ct. 1936, 1948 (2020), because disgorgement must be limited to a relief defendant's "net profit" and the SEC has not proved that Scott Coddington profited from the auto loan payments.

Between 2007 and 2009, Scott Coddington personally obtained loans to purchase four vehicles–an SSR, a Chevy Tahoe, a GMC truck, and a BMW—from his father. (Doc. # 318 at 109–10.) Scott Coddington testified that his father had purchased

the vehicles in cash but had "financial issues" and asked Scott Coddington and his wife to take out loans to purchase the cars to liquidate their values. (*Id.*) The cars were titled in Scott Coddington's name, and Scott Coddington was legally obligated to make payments on those loans. (*Id.* at 111.) Bank records admitted at the hearing demonstrate that 40 payments, totaling $59,517.23, were made from the Extreme Capital WFB 7064 account and the Golden Summit JPMC 9261 account to Alliant Credit Union, Bellco Credit Union, and Capital One Auto Car Pay toward the four car loans during the time period of July 26, 2010, through May 10, 2012. (Doc. # 321 at 27–28.) Scott Coddington testified that his father maintained sole possession and use of the vehicles at all relevant times before the loans were repaid and that Scott Coddington did not profit or benefit from the automobile loan payments.[4] (Doc. # 318 at 171, 181–82.) Scott Coddington further testified that Daniel Coddington insured the vehicles, exclusively drove the vehicles, and kept the vehicles at his house and garage. (*Id.* at 181.) Scott Coddington's credit was negatively affected by taking the loans out on the vehicles for his father, and Scott Coddington and his wife dealt with creditors seeking to repossess the vehicles. (*Id.* at 182.)

Having reviewed the evidence presented at the hearing and the applicable exhibits and documents from the case file, the Court finds that disgorgement of the $59,517.23 in auto loan payments is not authorized because Scott Coddington did not benefit or profit from the auto loan arrangement with his father. By incorporating

---

[4] Scott Coddington testified that sometime in 2012, after the loans were repaid, Daniel Coddington gifted him the GMC truck. (Doc. # 318 at 116.)

longstanding equity principles into 15 U.S.C. § 78u, "Congress prohibited the SEC from seeking an equitable remedy in excess of a defendant's net profits." *Liu*, 140 S. Ct. 1946. Accordingly, the Court may not enter a disgorgement award that exceeds the net profits made by Scott Coddington. The Court finds that Scott Coddington did not profit or benefit from the four auto loans because Scott Coddington did not use or control the four vehicles during the relevant time period.

**C.     PREJUDGMENT INTEREST**

"As with disgorgement, an award of prejudgment interest lies within the discretion of the Court." *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 385 (S.D.N.Y. 2007). Prejudgment interest on a disgorgement amount is intended to compel full disgorgement of ill-gotten gains by reasonably approximating the cost of borrowing such gain from the government. *SEC v. First Jersey Secs. Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996). The Court finds that an award of prejudgment interest at the IRS rate for tax underpayment should accompany disgorgement in this case. 21 U.S.C. § 6621(a)(2); *see First Jersey Secs. Inc.*, 101 F.3d at 1476 (observing that in disgorgement actions, courts have approved the IRS underpayment rate as a reasonable reflection of the cost to borrow money from the government).

**IV.     CONCLUSION**

For the foregoing reasons, it is ORDERED as follows:

- Relief Defendant Scott Coddington is hereby ORDERED to pay $136,000 in disgorgement, in addition to the $66,738.57 in disgorgement this Court previously

11

ordered Scott Coddington to pay in its August 10, 2021 Summary Judgment Order (Doc. # 293), for a total disgorgement amount of $202,738.57.

- Scott Coddington shall pay prejudgment interest on the full amount of disgorgement at the rate used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2) from the date of December 12, 2013.[5]

- The SEC shall submit a prejudgment interest calculation and proposed judgment within 14 days of entry of this Order.

DATED: June 8, 2022

BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge

---

[5] Because Scott Coddington is named as a Relief Defendant, the Court finds it appropriate to award prejudgment interest from the time the Complaint in this matter was filed placing him on notice of the possibly that the funds he received were derived from fraud and subject to disgorgement. *See SEC v. Antar*, 97 F. Supp. 2d 576, 592 (D.N.J. 2000) ("Principles of equity have somewhat more force with respect to the relief defendants . . . . While admittedly imprecise, calculating prejudgment interest from the filing of the complaint in some measure diminishes the prejudice to the relief defendants for conduct which they had no part in.").